**CRESTWOOD COMMONS REDEVELOPMENT CORPORATION, Plaintiff-Appellant,**

v.

**66 DRIVE-IN, INC., et al., Defendants-Respondents.**

No. 57645.

Missouri Court of Appeals,
Eastern District,
Division Three.

June 25, 1991.

Motion for Rehearing and/or
Transfer to Supreme Court Denied
July 23, 1991.

Application to Transfer Denied
Sept. 10, 1991.

Gerard Timothy Carmody, Sheila K. O'Malley, Thomas C. Walsh, St. Louis, for plaintiff-appellant.

Daniel T. Rabbitt, William T. Kacerovskis, St. Louis, for defendants-respondents.

STEPHAN, Judge.

Crestwood Commons Redevelopment Corporation ("Crestwood Commons") appeals from a judgment of the Circuit Court of St. Louis County, after a five day trial, in which the trial court found three ordinances of the City of Crestwood, Missouri invalid. We reverse and remand.

At issue is a tract of land located on Watson Road in the heart of Crestwood, Missouri. It is commonly known as the home of 66 Drive–In, Inc. ("66 Drive–In"), a drive-in movie theater that has operated seasonally for over forty years. In order to understand the current controversy, a chronological perspective is essential.

Beginning in March, 1983, the City of Crestwood commissioned the Urban Programming Corporation ("UPC") to analyze the condition of the Watson Road Corridor. The UPC identified fourteen parcels of property, including 66 Drive–In, that needed attention. The UPC then conducted a two-step process. First, it met with each property owner that was involved with the parcels, together with the Mayor and the City Administrator. The UPC informed the parcel owners of what the City of Crestwood felt were good uses for their property. Second, it asked the permission of each property owner to allow the parcels to be shown at a workshop that was held for metropolitan area developers. The purpose was to unite developer interest with potential properties. All but three of the parcel owners subsequently redeveloped their property. 66 Drive–In did not.

Between 1985 and 1987, the Mayor of the City of Crestwood, Patricia Killoren, had ongoing conversations with both Dierbergs and Schnucks. She tried to get Dierbergs to build a store in Crestwood, and also get Schnucks to expand its Crestwood store or build a new one. In the Spring of 1986, the Crestwood Board of Aldermen ("the Board of Aldermen") passed Ordinance 2053, which specifically regulated drive-in movie theatres. Despite its enactment, the City of Crestwood never cited 66 Drive–In for a violation of it.

Sometime in early 1987, John Brancaglione, the manager of the Planning Division for Campbell Design Group, suggested using one of the redevelopment statutes to improve the 66 Drive–In parcel. The City of Crestwood subsequently asked the Campbell Design Group to perform a blighting study.[1]

In the meantime, the City of Crestwood passed an ordinance that set forth certain standards regulating properties. Part of this ordinance consisted of "anti-blight standards". Despite enactment of this ordinance, the City of Crestwood never cited 66 Drive–In for a violation of it. About

this same time, Schnucks decided to build a supercenter to serve the greater Crestwood market. Schnucks desired to build it either on the 66 Drive–In property, or elsewhere at another location within the Western Watson Road corridor.

In December, 1987, the City of Crestwood's Watson Road Redevelopment Committee met. Brancaglione informed the Mayor and the Board of Aldermen that Schnucks was on a month-to-month lease and would soon be moving out because it wanted a larger store. The Mayor confirmed that she had heard from some of Schnuck's employees that Schnucks was closing. Though it is unclear who raised the issue of the 66 Drive–In property, clearly someone suggested at this meeting that this site was a prime spot for the development of a grocery store. In fact, the Mayor and several members of the Board of Aldermen considered this the only site available for a superstore. Therefore, someone suggested the use of Chapter 353 to redevelop it.

On January 26, 1988, the Board of Aldermen held a public meeting during which they discussed initiating a redevelopment program under the provisions of Chapter 353. Kent Leichliter, the Crestwood's City Administrator, read a memo to all of the Aldermen which states:

> [a]s this is the last large site available for development, particularly large enough for the development of a grocery store, we believe it necessary to initiate a redevelopment program under the provisions of Chapter 353 of the Missouri Statutes. Using this mechanism, the City can initiate the redevelopment of this site while maintaining control of the type and extent of development as well as who the developer will be.

On January 29, 1988, Schnucks contacted the Mayor and was directed to Brancaglione. On February 4, 1988, Schnucks met with Brancaglione. Brancaglione: (1) outlined the City's plans for the Drive–In site; (2) suggested Schnucks team up with

---

1. We note that John Brancaglione was formerly employed by the UPC when it conducted the 1983 study. Thus, the City effectively hired

someone who already determined that 66 Drive–In needed attention.

a well-liked developer: either Hycel or Sansone; and (3) advised Schnucks against teaming up with Ronald Krueger, President of Wehrenberg Theatres, owner of stock in 66 Drive–In, beneficiary of stock in 66 Drive–In, and eventual owner of the 66 Drive–In property.

Subsequently, in February, 1988, the Campbell Design Group completed its blighting study, entitled "An Analysis For Blighting Factors, Watson Road Development Area". At Crestwood's February 23, 1988 aldermanic meeting, the Campbell Design Group discussed its findings. Brancaglione indicated that the study area included 66 Drive–In, as well as adjoining commercial strip store tenants. He concluded that the study area evidenced many examples of building, structures and land uses which, because of age, obsolescence, inadequate or outmoded design, or physical deterioration have resulted in economic and social liabilities to the City and its residents. He also concluded that such conditions foster and are conducive to ill health, transmission of disease, crime or inability to pay reasonable taxes and thus may be found to be a blighted area. Brancaglione suggested that the study area be redeveloped so that the property consisted of a mixed use scenario. He recommended a state of the art grocery superstore, townhomes/condominiums, office space and retail/commercial space. During this meeting, Alderman Johnson, whose son works for Schnucks, asked Brancaglione to estimate the sales taxes generated by a superstore. Brancaglione indicated that the grocery store alone would generate approximately $280,-000 annually in sales taxes.

In late February, or early March, 1988, Schnucks teamed up with Hycel Properties, Co., thereby forming Crestwood Commons.

At Crestwood's March 8, 1988 aldermanic meeting, the "Watson Road Redevelopment Area Blighting Ordinance, Bill No. 61–87, was first introduced." This ordinance declared blighted all the property recommended by Brancaglione. Also introduced at this meeting was the "Watson Road Redevelopment Area/Procedures Ordinance", No. 62–87. Both bills were held for additional consideration.

On March 16, 1988, Crestwood's Mayor met with the strip store operators. She promised that if they collectively decided that they wanted to be removed from the redevelopment area, she would make this recommendation to the Board of Aldermen. We note, however, that the Mayor did not give 66 Drive–In this same option.

On March 18, 1988, 66 Drive–In contracted to purchase the Drive–In property from the fee owner, Marguerite Crain, for a total sales price of $3,500,000. 66 Drive–In's attorney, Gus Nations, notified the Board of Aldermen of this at the March 22, 1988 aldermanic meeting. He explained that 66 Drive–In intended to retain an architect so that 66 Drive–In could develop the property itself. He indicated that 66 Drive–In would prepare a development plan and would submit an application for a special use permit. Nations requested that the Aldermen withdraw Bill Nos. 61–87 and 62–87. Despite this request, said bills were read for a second time. The Aldermen did, however, agree to hold both bills until the April 12, 1988 aldermanic meeting. After the March 22, 1988 reading, the Aldermen opened the floor to comments. Lee Wagman, president of Hycel Properties, Co., thanked the Board of Aldermen for initiating the 353 procedure. The strip store operators also presented 1,400 signatures in support of not blighting their businesses. After the meeting, Alderman Franz approached Nations and informed him that since 66 Drive–In became the owner of the 66 Drive–In property, the City would now work with them. Additionally, Hycel Properties Co. and Schnucks met and decided to schedule a meeting with the Mayor to discuss which Aldermen needed to be approached for support.

On March 28, 1988, Schnucks met with both Crestwood's Mayor and City Administrator to discuss the reasons why the blighting process should proceed. Nevertheless, the Mayor refused to meet with 66 Drive–In.

On March 30, 1988, Hycel and Schnucks sent letters to the Crestwood Aldermen,

urging them to vote to blight the drive-in. Hycel and Schnucks sent a substantially similar letter to the Mayor on April 4, 1988. On April 12, 1988, the Mayor introduced Bill No. 61A, a substitute bill for Bill No. 61–87. The substitute bill removed the strip stores from the blighted area. It was read both for a first and second time. Then, Alderman Murray moved to suspend the rules of procedure so that Bill No. 61A could be read for a third time. This motion passed unanimously. Attorney Nations subsequently asked to address the Board before a third reading. The Mayor refused, stating that Nations could speak after the vote. Thereafter, the Bill was read for a third time. By a vote of 7 to 1, the Board voted to blight the Drive–In pursuant to Chapter 353, RSMo 1986. Bill No. 61A was assigned Ordinance No. 3056.

Also on April 12, 1988, the Board of Aldermen passed Bill No. 62–87 by a vote of 8 to 0. This Bill was assigned Ordinance No. 3057. Ordinance No. 3057 not only specified the procedure for the submission of development plans and a selection of a developer, it also granted the chosen redevelopment corporation the power of eminent domain, if necessary. After the Bill No. 62–87 vote, the Board opened the floor for comments. Some Aldermen expressed favoring the 353 procedure due to the control they would have over the development. Neither 66 Drive–In nor its attorney commented.

On April 19, 1989, the Mayor wrote a letter to the Crestwood–Sunset Hills Chamber of Commerce. The Mayor stated: "[i]t was the proposed loss of our only grocery store that prompted the Board of Aldermen to decide using [sic] the 353 mechanism. This will allow the City ... to have control during implementation—over and above our normal zoning requirements."

On May 3, 1988, the Board of Aldermen met to explain to prospective developers the procedure for applying for authority to redevelop the property. The City issued guidelines to govern the submission of redevelopment plans. Neither Crain nor any representative of 66 Drive–In attended the presubmission meeting.

On June 22, 1988, 66 Drive–In entered into a contract with Daniel J. Devereux, Joseph Pottebaum and Robert Kaplan to sell the 66 Drive–In property to them for $7,200,000. Devereux, Pottebaum and Kaplan were closely allied with Crestwood Festival Associates ("CFA"). In fact, the contract was contingent upon CFA being chosen as the developer.

By July 6, 1988, three development plans were submitted: one by Crestwood Commons, one by CFA and one by Centennial Development Co. Neither Crain nor 66 Drive–In submitted a plan.

From August 16th to August 18th, 1988, the City conducted three consecutive evenings of special public hearings to discuss each of the development plans. On the night that CFA's plan was discussed, Trammell Crow, the general partner in CFA, represented to the Mayor and to the Board that CFA owned the 66 Drive–In property. We note that although CFA, through its local partners, had contracted to purchase the property, they had not closed on it. We also note that no representatives of 66 Drive–In attended any of the special public hearings.

On September 6, 1988, the Board of Aldermen, by a vote of 5 to 3, passed Resolution 10–88, thereby granting preliminary approval to Crestwood Commons for the redevelopment of the 66 Drive–In site. The Aldermen stipulated that this preliminary approval could be revoked by the City at any time in its absolute discretion. Since the Board of Aldermen selected Crestwood Commons as the developer, 66 Drive–In's sale contract with Devereux, Pottebaum and Kaplan terminated.

On November 28, 1988, 66 Drive–In closed on the 66 Drive–In property, thereby acquiring fee title. Two days later, 66 Drive–In sent a letter to Crestwood Commons. It stated in pertinent part: "we will sit down with anyone who is genuinely interested in acquiring our property for a reasonable price." Communications between representatives of Crestwood Commons and 66 Drive–In ensued. However, the negotiations stalled in early 1989, causing Crestwood Commons to appear at a

January 10, 1989 Crestwood aldermanic meeting to report a deadlock. During this meeting, the City's special counsel met with the parties in the Mayor's office. The parties tentatively agreed on a sales price of $6.7 million. They also agreed that the offer was open for forty-eight hours. However, before the forty-eight hours had expired, the City's Special Counsel called Crestwood Commons only to find that Crestwood Commons could not come to a conclusion within the time limits. The City's Special Counsel informed 66 Drive-In of the situation, at the same time noting that Crestwood Commons was still interested in obtaining the property.

Numerous drafts of a comprehensive sale contract were exchanged during the ensuing eight weeks. The purchase price remained at $6.7 million. Though Crestwood Commons believed that it had reached an agreement with 66 Drive-In to purchase the property on March 10, 1989, in reality, 66 Drive-In had previously contracted to sell the property to CFA in exchange for $7 million and a 10% interest in CFA.

On April 5, 1989, the City of Crestwood Planning, Zoning, and Architectural Review Commission, by a vote of 4 to 2, recommended to the Board of Aldermen the approval of a special use permit to CFA, CFA's architect, and 66 Drive-In. This special use permit would allow CFA to construct a retail center on the 66 Drive-In property.

Six days later, the Board of Aldermen passed Ordinance No. 3105, after only two readings, by a vote of 5 to 3. The ordinance provided that it was necessary and in the public interest to grant Crestwood Commons the power of eminent domain to complete its development plan.

The passage of Ordinance No. 3105 was subsequently called into question. At some point [2], the Board of Aldermen passed Ordinance No. 3081 which reduced the number of required bill readings from three to two. However, it required an af-

firmative vote of two thirds of the members if the vote for final passage occurred at the same meeting at which the bill was introduced.

Therefore, on July 5, 1989, the Board of Aldermen held a special meeting to read, for a first time, a new bill which was similar to Ordinance No. 3105. The Board of Aldermen enacted this new bill, after some amendments, on July 11, 1989. The Aldermen assigned it Ordinance No. 3119.

The City subsequently entered into a development contract with Crestwood Commons. Pursuant to this development contract, Crestwood Commons agreed to indemnify the City for any monetary claim against the City, as well as court costs, in the event 3056, 3057 or 3119 or the development agreement were contested in court. Crestwood Commons conditioned indemnification to the extent that it would only indemnify the City against any judgment or court costs that were not covered by insurance. Finally, the parties agreed that Crestwood Commons would have the right to conduct the City's defense in such a suit.

On July 13, 1989, Crestwood Commons filed a petition in Circuit Court seeking to condemn the 66 Drive-In property. On September 5, 1989, 66 Drive-In filed a motion to dismiss this petition. 66 Drive-In challenged the validity of Ordinance Nos. 3056, 3057, and 3119. A hearing was held shortly thereafter.

In the meantime, on September 12, 1989, the Board of Aldermen approved a special use permit for CFA, Trammell Crow Company, and 66 Drive-In to construct and operate a retail center on the 66 Drive-In property. However, the Board of Aldermen stipulated that the special use permit would not be issued until:

a final judgment as to which no rights of appeal remain, is issued by a court of competent jurisdiction that:

a) The grant of this special use permit will not breach the terms, both express and implied, of that certain Development

---

**2.** We note that in the July 5, 1989 Board of Aldermen minutes it indicates the date as September 13, 1989. Obviously this ordinance must have been passed prior to July 5, 1989 for it to have been an issue.

Agreement by and between the City of Crestwood and [Crestwood Commons] dated July 11, 1989 and Ordinance 3119; and

b) The denial of the special use permit on the grounds that redevelopment rights and the power of eminent domain have been granted to, and certain obligations have been imposed on, [Crestwood Commons] by the aforesaid Development Agreement and Ordinance 3119 violates the rights of [CFA], Trammell Crow Company and/or [66 Drive–In].

On October 18, 1989, the trial court issued Findings of Facts and Conclusions of Law denying Crestwood Commons' petition for condemnation. The court found that the Board of Aldermen's decision to blight the property and its approval of Crestwood Commons' redevelopment plan was arbitrary, induced by legal bad faith and legal collusion. The court also found the ordinances inflicted with various constitutional infirmities. Specifically, the court found Ordinance No. 3056 void and unenforceable because Section 21 of Article 6 of the Missouri Constitution does not permit a city to declare that an individual property is a blighted area. It also found Ordinance No. 3056 void and unenforceable because it violated 66 Drive–In's right to equal protection of the laws granted by both the Missouri and United States Constitutions. Finally, the court found Ordinance No. 3057 void and unenforceable because it violates Section 40 of Article 3 of the Missouri Constitution. Moreover, the court found that the granting of eminent domain was neither necessary to get the property developed nor did it serve a public purpose or use. The court similarly concluded that this decision was arbitrary, induced by legal bad faith and collusion.

On November 2, 1989, Crestwood Commons filed a motion to amend or, alternatively, for a new trial. The trial court heard and overruled Crestwood Commons' motion. This appeal followed.

■ In this court tried case, we affirm unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). At the outset, we note that 66 Drive–In moved to strike pages 31 to 32 of Crestwood Commons' brief (including footnote 14), Addendum C of Crestwood Commons' brief, and footnote 3 on page 7 of Crestwood Commons' reply brief on the ground that said portions contained matters which did not appear in evidence or the transcript.

■ Page 32 and Addendum C of Crestwood Commons' brief, as well as footnote 3 of its reply brief, do contain facts which were not in evidence or in the transcript. Since the presentment of evidence extraneous to the trial court record should not be considered on appeal, we strike these portions. *First Nat. Bank of Carrollton v. McClure*, 666 S.W.2d 434, 436 (Mo.App.1983). Moreover, Addendum C contains an affidavit not material to the questions presented on appeal. This inclusion violates Rule 81.12(b) which states: "[n]o matter touching on the organization of the court, or any continuance motion, or affidavit, not material to the questions presented for determination, shall be inserted in the record on appeal." This violation of the Rules is not condoned. The motion is denied as to page 31 which only contains evidence that was before the trial court.

## POINT I

Crestwood Commons' first point on appeal is that the trial court erred in holding that the City of Crestwood improperly blighted the 66 Drive–In property and granted plaintiff eminent domain because there was no evidence that the City's legislative determination was arbitrary or induced by bad faith, fraud or collusion.

1. *The Board of Aldermen's determinations that 66 Drive–In is a blighted area and its approval of Crestwood Commons' redevelopment plan.*

In determining that the 66 Drive–In property was a blighted area, the Board of Aldermen concluded that it met the re-

quirements of Section 353.020(2), RSMo 1986, which states:

> [b]lighted area shall mean that portion of the city within which the legislative authority of such city determines that by reason of age, obsolescence, inadequate or outmoded design or physical deterioration, have become economic and social liabilities, and that such conditions are conducive to ill health, transmission of disease, crime or inability to pay reasonable taxes.

In making its determination that an area is blighted, and in approving the redevelopment plan, the Board of Aldermen acted in its legislative capacity. *Allright Missouri v. Civic Plaza Redevelopment,* 538 S.W.2d 320, 324 (Mo.1976). Judicial review is limited to whether the legislative determination was arbitrary or was induced by fraud, collusion or bad faith or whether the City exceeded its powers. *Parking Sys., Inc. v. Kansas City Down. Redev. Corp.,* 518 S.W.2d 11, 15 (Mo.1974).

The issue of whether a legislative determination is arbitrary rests on the facts of each case. *Allright Missouri v. Civic Plaza Redevelopment, supra,* 538 S.W.2d at 324. In determining whether the burden is met, it must be kept in mind that courts cannot interfere with a discretionary exercise of judgment in determining a condition of blight in a given area. *Id.* Unless it appears that the conclusion of the Board of Aldermen in the respect in issue is clearly arbitrary, we cannot substitute our opinion for that of the Board. *Id.* If the Board's action is reasonably doubtful or even fairly debatable we cannot substitute our opinion for that of the Board. *Id.*

The evidence here did not compel a conclusion that the area was blighted and the proposed redevelopment plan necessary and in the public interest. Similarly, the evidence did not compel a decision that it was not. There was room for reasonable differences and fair debate on this issue. From the evidence, the Board reasonably could have concluded both that the area was blighted within the meaning of Section 353.020 and that a redevelopment plan was necessary. Therefore, it may not be said that either the Board's determination that the 66 Drive–In property was blighted or its approval of Crestwood Commons' redevelopment plan was an arbitrary exercise of legislative power. The trial court erred in finding otherwise. Finally, there is no indication that either the Board's determination that 66 Drive–In is a blighted area or its approval of Crestwood Commons' redevelopment plan was induced by fraud, collusion or bad faith.

*2. The Board of Aldermen's decision to blight a single piece of property.*

The trial court held that the Board of Aldermen's decision to blight the 66 Drive–In property in Ordinance No. 3056 was void and unenforceable because Section 21 of Article 6 of the Missouri Constitution does not permit a city to declare that an individual property is a blighted area. We find this holding in error. To uphold this proposition would mean that if a single property owner owned an entire city block which was centrally located in a downtown area, a legislative body would be unable to declare the parcel blighted even if the block was a slum. We do not believe it was the intent of the framers of our constitution to allow such a situation to occur. Thus, a Board of Aldermen may properly blight an individual parcel of property.

Finally, before we address the third subpoint of point 1, we note that after the trial, the court met with the parties in chambers to explain the reasons for its rulings. During this discussion, the court stated "economic underutilization is not a basis to declare something blighted." Though this was not one of the trial court's conclusions of law, we will briefly address this remark. In 1987, our Supreme Court stated: "[t]he concept of urban redevelopment has gone far beyond 'slum clearance,' and the concept of economic underutilization is a valid one." *Tierney v. Planned Indus. Expansion Auth.,* 742 S.W.2d 146, 151 (Mo. banc 1987). Thus, the trial court's remark is unfounded.

*3. The Board of Aldermen's determination to take 66 Drive–In under the power of eminent domain.*

In reviewing the Board of Aldermen's determination to take the 66

Drive–In property under the processes of eminent domain, we look to the standard set forth by our Supreme Court in *Annbar Associates v. West Side Redevelopment Corp.*, 397 S.W.2d 635, 646 (Mo. banc, 1965). In that case, the court quoting from *State on Inf. of Dalton*, 364 Mo. 974, 270 S.W.2d 44, 52 (1954), held that:

> a legislative finding ... that a blighted or insanitary area exists and that the legislative agency proposes to take the property therein under the processes of eminent domain for the purpose of clearance and improvement and subsequent sale upon such terms and restrictions as it may deem in the public interest will be accepted as conclusive evidence that the contemplated use thereof is public, unless it further appears that the legislative finding was arbitrary or was induced by fraud, collusion or bad faith.

Thus, we will accept the Board of Aldermen's decision to take 66 Drive–In property as conclusive evidence that the contemplated use is public unless we find that the Board's determination was arbitrary or was induced by fraud, collusion or bad faith. Again, unless it appears that the conclusion of the Board is clearly arbitrary, we cannot substitute our opinion for that of the Board. *Allright Missouri v. Civic Plaza Redevelopment, supra,* 538 S.W.2d at 324; *see also Schweig v. Maryland Plaza Redevelopment Corp.*, 676 S.W.2d 249, 254 (Mo.App.1984). Here, we cannot substitute our opinion for that of the Board even if its action could reasonably be characterized as doubtful or fairly debatable. *Allright Missouri v. Civic Plaza Redevelopment, supra,* 538 S.W.2d at 324. Moreover, we do not find the least indication that the Board's determination to take 66 Drive–In was induced by fraud, collusion or bad faith. The trial court erred in finding otherwise.

■ We further find the trial court's determination that Crestwood Commons was improperly granted the power of eminent domain because the property could be redeveloped by 66 Drive–In without the necessity of eminent domain an erroneous declaration of the law. In *Schweig v. Ma-* *ryland Plaza Redevelopment Corp.*, 676 S.W.2d 249, 254 (Mo.App.1984), we held that where a statute authorizes the taking of a fee, a court may not invalidate such taking on the ground that only a lesser interest was required to accomplish the purpose the legislature had in view. We also held that this is a legislative and not a judicial question. *Id.* Thus, we will not invalidate Ordinance No. 3119 on the ground that 66 Drive–In could itself redevelop the Drive–In property. This is a legislative question which we will not disturb.

### POINT II

Crestwood Commons' second point on appeal is that the trial court erred in concluding that the ordinances violate the equal protection clauses of both the United States and Missouri Constitutions or Article III, Section 40, of the Missouri Constitution because such conclusions are: (a) unsupported by any evidence or findings of fact; (b) based on an erroneous standard of review; (c) erroneous as a matter of law; and (d) contrary to well-established precedent.

*1. The trial court's determination that the ordinances violate the equal protection clauses of both the United States and Missouri Constitutions.*

■ At the outset, we note that the trial court failed to specify why Ordinance No. 3056 violates 66 Drive–In's rights to equal protection of the law. Presumably, the trial court felt that when the Board of Aldermen excised from the blighted area all parcels other than the Drive–In property, it violated 66 Drive–In's property equal protection rights. Thus, we will proceed on this assumption.

Both parties agree and cite *Reynolds v. Sims*, 377 U.S. 533, 578, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506 (1964), for the proposition that an equal protection violation occurs when a governmental authority discriminates between persons of the same class without any rational basis for doing so. In subsequent cases the Supreme Court has explained that the equal protection safeguard is only offended if a legisla-

ture's classification rests on grounds wholly irrelevant to the achievement of the legislature's objective. *McGowan v. Maryland*, 366 U.S. 420, 425, 81 S.Ct. 1101, 1104, 6 L.Ed.2d 393 (1961). Moreover, the Supreme Court has concluded that legislatures are presumed to have acted within their constitutional power despite the fact that their laws in practice result in some inequality. *Id.* Furthermore, a statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it. *Id.* at 426, 81 S.Ct. at 1105.

Here, the Board of Aldermen's decision to blight the 66 Drive-In property and not to blight the strip store owners' property may have been rationally related to a legislative goal: rapid redevelopment of the Watson Road Area. The Board of Aldermen could have conceivably concluded that the strip store owners would readily rehabilitate their own properties while at the same time concluding that the uncertainty of ownership of the 66 Drive-In property would make rapid rehabilitation unlikely. We are mindful of a passage from a Supreme Court case which is particularly appropriate here though it did not deal explicitly with an Equal Protection Problem:

> It is not for the courts to oversee the choice of the boundary line nor to sit in review on the size of a particular project area. Once the question of the public purpose has been decided, the amount and character of land to be taken for the project and the need for a particular track to complete the integrated plan rests in the discretion of the legislative branch. *Berman v. Parker*, 348 U.S. 26, 35–36, 75 S.Ct. 98, 103–104, 99 L.Ed. 27 (1954).

These principles apply here. Thus, we leave to the legislative branch the determination of which properties the city needs to include within a redevelopment project.

2. *The trial court's determination that Ordinance No. 3057 is void and unenforceable because it is a special law which violates Section 40 of Article 3 of the Missouri Constitution.*

■ Again, at the outset, we note that the trial court failed to specify which sub-part of Section 40, Article 3 of the Missouri Constitution Ordinance No. 3057 violates. Presumably, the trial court felt that Ordinance No. 3057 violates Section 40(30) which states:

> [t]he general assembly shall not pass any local or special law ...
>
> (30) where a general law can be made applicable, and whether a general law could have been made applicable, is a judicial question to be judicially determined without regard to any legislative assertion on that subject.

Thus, we will proceed on this assumption.

We cannot argue that the enactment of Ordinance No. 3057 violates Section 40(30). This case is limited to the redevelopment of a single piece of property. It is unrealistic that the framers of our constitution intended that a Board of Aldermen would have to enact a redevelopment ordinance for the whole city in order to redevelop a single parcel. Thus, the trial court's finding that the Board of Aldermen's redevelopment ordinance which governed the redevelopment of a single piece of property violated Section 40(30) of the Missouri Constitution, is in error.

Pursuant to Rule 84.14, we enter the judgment the trial court should have entered. Thus, we grant Crestwood Commons' petition seeking to condemn the 66 Drive-In property. We also remand this case so that the trial court can appoint three disinterested Commissioners of the County of St. Louis, Missouri, to ascertain what, if any, damages the owners of the 66 Drive-In property may sustain as a consequence of the appropriation of their property, pursuant to Chapter 523, RSMo 1986.

REINHARD, P.J., and CRANE, J., concur.