MERAMEC VALLEY R–III SCHOOL
DISTRICT, Plaintiff/Appellant,

v.

CITY OF EUREKA, Missouri,
Defendant/Respondent,

and

JBA Eureka, LLC,
Intervenor/Respondent.

No. ED 91678.

Missouri Court of Appeals,
Eastern District,
Division Three.

Feb. 24, 2009.

Motion for Rehearing and/or Transfer to
Supreme Court Denied April 16, 2009.

Application for Transfer Denied
May 26, 2009.

Michael H. James, A. Melissia Black Riddle, Chesterfield, MO, for Appellant.

James E. Mello, Jeffery T. McPherson, Deanna M. Wendler Modde, Saint Louis, Gerard T. Carmody, Kelley F. Farrell, Clayton, MO, for Respondent.

SHERRI B. SULLIVAN, Judge.

### Introduction

Meramec Valley R–III School District (School District) appeals from the judgment of the trial court granting summary judgment in favor of the City of Eureka, Missouri (City) and JBA Eureka, LLC (Developer). We affirm.

1. All statutory references are to RSMo 2000,

### Factual and Procedural Background

In the underlying action, School District challenged the propriety of City's adoption of an ordinance authorizing the use of tax increment financing (TIF) for a redevelopment project.

### TIF Act

The Real Property Tax Increment Allocation Redevelopment Act (TIF Act), Sections 99.800–99.865,[1] was enacted in 1982, to allow urban renewal of blighted areas by permitting tax abatements to be used for the redevelopment of these areas. *City of Arnold v. Tourkakis,* 249 S.W.3d 202, 205 (Mo.banc 2008). The TIF Act authorizes a city or municipality to utilize eminent domain to take property to facilitate redevelopment, *Id.,* and undertake a redevelopment project under certain conditions laid out in Section 99.810. See *State ex rel. City of Desloge v. St. Francois County,* 245 S.W.3d 855, 858 (Mo.App. E.D.2007). Funds for the redevelopment project come essentially from the future increase in the value of the land once the redevelopment project is complete. *City of Desloge,* 245 S.W.3d at 858.

The TIF Act calls for the city implementing the plan to create a TIF Commission to formulate the plan and oversee its implementation. *City of Desloge,* 245 S.W.3d at 858, Sections 99.820.2 and 99.820.3. The Commission's actions are subject to the final approval of the governing body of the municipality. *City of Desloge,* 245 S.W.3d at 858, Section 99.820.3. The Commission's recommendations go into effect upon the municipality's adoption of them by ordinance or resolution. *City of Desloge,* 245 S.W.3d at 858, *see, e.g.,* Sections 99.820.1(14); 99.820.3; 99.825; 99.835.

unless otherwise indicated.

Once the redevelopment plan is in place, the municipality begins to accumulate funding in a special allocation fund. *City of Desloge*, 245 S.W.3d at 858. Each year that the post-plan assessed value of the taxable real property within the redevelopment project area exceeds the pre-plan assessed value, property taxes on the increase in value are abated. *Id.* Instead of paying taxes, the landowners make payments in lieu of taxes equal to the amount the taxes would have been after improvements. *Id.*, Section 99.805(10).

### City's Past, Failed Redevelopment Plans

On September 1, 1992, the Board of Aldermen of City (the Board) duly constituted the Tax Increment Financing Commission of the City of Eureka (the TIF Commission). In 1996, the TIF Commission considered a proposal to redevelop an area of City encompassing 382 acres, which was blighted in many significant respects, as defined in Section 99.805, and had not been, nor was reasonably anticipated to be, subject to development through investment by private enterprise.

The City considered plans for the redevelopment of this area in 1996 and 1997, adopting TIF for the 1997 plan via Ordinance 1306. The City then authorized the execution of a redevelopment agreement. However, the redevelopment plan did not proceed and the redevelopment agreement was terminated.

### Current Redevelopment Plan

On May 2, 2005, Peckham Guyton Alberts & Viets, Inc. Urban Consulting (PGAV) prepared a new plan for redevelopment for the TIF Commission's consideration. This plan was titled "Tax Increment Financing Redevelopment Plan—Eureka S. I–44 Redevelopment Area" (Redevelopment Plan), consisting of approximately 938 acres in the City (Redevelopment Area or Area). On May 16, 2005, Developer, in response to the City's solicitation of proposals for developing the Redevelopment Area, submitted a proposal (Redevelopment Proposal).

### The Plan's Detailed Conditions of the Redevelopment Area

PGAV prepared the detailed analysis of the factors that characterize the Redevelopment Area as qualified for TIF development. In compiling the information detailing the conditions of the Redevelopment Area for the Redevelopment Plan, a number of sources of information were relied upon, including PGAV's exterior conditions field investigations conducted in January of 2004 and February of 2005. Also, information on assessment, site improvements, building conditions and market conditions was gathered from data and records of the City and the St. Louis County Assessor. The evidence gleaned from the Redevelopment Plan was presented to the trial court prior to the time the motion for summary judgment was taken under consideration and consists of the following uncontroverted facts.

### Defective and Inadequate Street Layout

At the time the 2005 Redevelopment Plan was proposed and submitted, the Redevelopment Area demonstrated defective or inadequate street layout as follows.

In 1973, the "St. Louis County Report 2" noted that "... roads are in very poor condition; they are of gravel, full of potholes, and have steep grades." In 2005, these conditions, as noted in 1973, had not been eliminated and therefore still existed. The PGAV report found that "[n]early all of the intersections within the central portion of the [Redevelopment] Area are poorly designed and so overgrown with weeds

that appropriate sight triangles do not exist."[2]

The streets in the Redevelopment Area were found to be either platted, but not constructed, or obsolete and inadequate. Specifically, with the exception of a few,[3] the remaining streets in the Redevelopment Area represented an inadequate overall street system incapable of supporting any significant development.

The PGAV report noted that the paved road surfaces in the Redevelopment Area, except for Wengler Road, are badly deteriorated and have no curbs or gutters. The remaining streets in the Redevelopment Area are narrow and unpaved. The PGAV report observed that the streets frequently allow for the passage of only one vehicle, thereby making them obsolete, inadequate and outmoded in design and function. The ditches adjacent to the roads are severely eroded, creating dangerous conditions.

### O'Sullivan Avenue Bridge

The bridge over the railroad tracks at O'Sullivan Avenue was determined to be inadequate and obsolete. A 2001 study entitled "Eureka South I–44 Access Feasibility Study" by Crawford Bunte and Brammeier Traffic and Transportation Engineers (CBB) described the access problems of the O'Sullivan Avenue Bridge:

> The (O'Sullivan Avenue) bridge is less than 20 feet wide with substandard approaches to the adjacent intersections. Further exacerbating conditions are the grades on this bridge, which are steep and in excess of appropriate standards, and deterioration of the bridge deck and structure itself.

The bridge crosses the Union Pacific rail lines (2 sets of tracks), which are depressed, but the road also crosses the Burlington Northern line (1 set of tracks) at grade immediately south of the bridge. In order to meet the elevation of Old Highway 66 to the north, the bridge was constructed with steep grades on either side (particularly the north), resulting in an "arch" that severely limits its functionality.

Recent traffic counts indicate that the bridge currently carries more than 2,000 vehicles per day (vpd) . . . a roadway of this width . . . should carry loads of no more than 400 vpd. It can therefore be concluded that the O'Sullivan bridge already exceeds its functional capacity.

PGAV found that the insufficient bridge infrastructure directly impacted the accessibility of the Redevelopment Area to the interstate highway system. It noted that "[a]pproach from the direction of the Interstate or from the I–44 business loop must be done with extreme caution and at greatly reduced speeds, which presents a danger not only to residents and visitors of the Area, but also to other drivers on these primary roads, and poses even greater risks for drivers not familiar with the Area." PGAV concluded that "[t]his condition, coupled with the railroad crossing immediately east of the bridge, is a dangerous condition."

In its summary of its findings of defective or inadequate street layout in the Redevelopment Area, PGAV summarized that "the roadway layout and pattern of the Redevelopment Area is inadequate and

---

**2.** Sight triangles are the areas of visibility required on a corner to allow for the safe operation of vehicles, cyclists, and pedestrians in the proximity of intersecting streets, sidewalks, and bicycle paths.

**3.** Eureka/Allenton Road, Hunters Ford Road, and the portion of Allenton generally bounded by Main Street, Brown Avenue, Second Street, and Macoffin Avenue, were the few exceptions to this finding of inadequate street layout.

obsolete for the current uses and planned future uses, when measured against current City, County, State, and National standards for the construction of this infrastructure." It found this conclusion was true of "both the deteriorated street grid in the 'Allenton' area, as well as the vacant land, portions of which had no access to the generally inadequate road network that currently exists."

The report specifically declared that the roadway layout and pattern of the Redevelopment Area was "inadequate for the uses permitted under the City's zoning code and the types of uses which would allow the Area to achieve its economic potential," including "impaired accessibility of the Area from the interstate highway system due to the significant costs of reconstructing a bridge to safely traverse the railroad tracks" that separated the Redevelopment Area from the interstate and "adequately accommodate vehicular traffic associated with a master-planned residential community and regional retail/commercial center."

The CBB report indicated that many streets in the Redevelopment Area have slopes well in excess of 10 percent, with several being at least 15 percent. A ten percent slope is considered the absolute maximum by St. Louis County standards and Eureka's Subdivision Regulations. CBB also noted the streets' unpaved condition and rutted surfaces as well as lack of storm drainage.

The CBB report noted that vehicular travel was unsafe in any vehicle type on the roadways in most of Allenton, especially in inclement weather and/or at night. The roads in some instances were bordered by rocky hillsides or steep embankments or ravines, without shoulders or lateral setbacks of trees, utility poles, street lights or other structures. The roads only allowed for safe passage of one vehicle with poor to nonexistent views of oncoming traffic. CBB determined that these hazardous conditions do not portend successful rescue missions for emergency vehicles of any kind.

### Improper Subdivision and Obsolete Platting

At the time the 2005 Redevelopment Plan was proposed and submitted, the Redevelopment Area demonstrated improper subdivision and obsolete platting as follows.

PGAV noted irregularly shaped and inefficiently used parcels in the Redevelopment Area, and that 23 percent of the parcels in the Area constituted improperly divided subdivisions. Less than 40 percent of the total number of parcels in the Redevelopment Area have frontage to a paved roadway or street, a violation of the City's subdivision codes. PGAV concluded that new development of these properties, as well as vacant land to the west, which had few points of access to paved roads, and in the case of a majority of properties, no access, would require re-subdivision to meet existing codes.

### Deterioration of Site Improvements

At the time the 2005 Redevelopment Plan was proposed and submitted, the Redevelopment Area demonstrated deterioration of site improvements as follows.

The PGAV report found that "[n]early 85 percent (51 of 60) of the existing improved properties in the Redevelopment Area show signs of deterioration of site improvements," including buildings in need of painting, siding or roofing repair or replacement; driveway, walkway, or parking area pavement deterioration; leaning building walls; sagging roofs; collapsing or sagging porches; broken windows; cracked masonry; deteriorated streets and

drainage ditches; inadequate and deteriorated parking lots; numerous vacant buildings; dilapidated outbuildings; and yards trashed with derelict lawn mowers, automobiles, furniture and building materials. Also, six obsolete mobile home units were scattered throughout the Allenton neighborhood.

### Trash Dumping and Obsolete or Nonexistent Septic Systems

The City also found that the remote nature of the Redevelopment Area promoted the dumping of trash and debris, which is an illegal activity. Such dumping contributed to blighted conditions and also promoted unsanitary conditions and presented potential environmental hazards.

It was found that only a portion of Allenton was served by water and sanitary sewer systems. The remaining parts of the area had privately maintained septic systems, which PGAV found were likely to have the typical overflow and soil and water pollution problems associated with septic systems, especially the older types of systems typical in Allenton. The 1973 St. Louis County Report 2 noted that the area suffered from water and sewage disposals that were inadequate, and these had not been significantly improved since that time.

### Economic Underutilization

At the time the 2005 Redevelopment Plan was proposed and submitted, the Redevelopment Area demonstrated economic underutilization as follows.

The PGAV report indicated that, based on data given to PGAV by the City, sales revenue in the Redevelopment Area was generated by two commercial businesses, and comprised less than 0.01 percent of the City's sales revenue from 1997–2004. Between 2002 and 2003, sales revenue in the Redevelopment Area fell 35 percent and between 2003 and 2004 fell 69 percent.

PGAV determined that despite the poor returns of the Redevelopment Area, "the overall growth in EAV of the City is indicative of the rapid growth and development of the City in general," which is "part of a larger trend of development in the western part of St. Louis County along the I–44 corridor, and in the western part of the St. Louis Metropolitan Area, in general." The Redevelopment Area is located in a high population growth area of the St. Louis Metropolitan Region. The Redevelopment Area itself is in close proximity to an interchange with Interstate 44, and therefore has highway visibility. The Redevelopment Area is also close to a regional attraction, the Six Flags Amusement Park. However, despite these positive attributes indicative of potential economic growth, PGAV determined that the Redevelopment Area has not been subject to redevelopment because of the Area's copious blight factors.

The City previously attempted to promote commercial development in the Area through the TIF Act in 1996 and 1997, but these attempts failed, due to what PGAV determined to be the severity of the blighting factors, as well as the substantial cost to eradicate those factors. After the failure of the 1996 and 1997 development proposals, which encountered significant extraordinary costs of development that made the developments economically infeasible within the former TIF Districts, the City determined in 2005 that a larger redevelopment area, with more development activity, was necessary.

### Statutory TIF Proceedings

On August 1, 2005, after giving notice pursuant to Section 99.825.1, the TIF Commission held a public hearing with regard to the Redevelopment Project in

conformance with Sections 99.820.4 and 99.825.1. After the hearing, the TIF Commission disapproved the Project. On August 16, 2005, the Board received further comment from interested persons and taxing districts. After consideration of comment from the planning consultant, Developer, special TIF counsel, the public, and the recommendation forwarded by the TIF Commission, the Board passed Ordinance 1845 in which it designated the Redevelopment Area and adopted the Redevelopment Plan and Project.

### Ordinances 1845 and 2016

In Ordinance 1845, the Board made a finding that the Redevelopment Area on the whole was a blighted area as defined in Section 99.805(1) of the TIF Act, and had not been subject to growth and development through investment by private enterprise and would not reasonably be anticipated to be developed without the adoption of TIF and the Redevelopment Plan.

On February 21, 2006, the City and the Developer entered into a Redevelopment Agreement. On October 29, 2007, the TIF Commission held another public hearing on a proposed amendment to the Plan. Although the TIF Commission again disapproved the Redevelopment Plan, as amended, the Board adopted the Plan with the amendment. In Ordinance 2016, the Board ratified and affirmed the findings set forth in Ordinance No. 1845, and approved and adopted the Plan Amendment, and the amendments to the Redevelopment Project described therein.

The City then issued TIF obligations pursuant to the TIF Act.

### Trial Court Proceedings

In 2008, School District filed an action against City claiming that the Redevelopment Project was void from its inception. Developer was not a named party to the action, and obtained leave to intervene. The City filed a motion for summary judgment, in which Developer joined. School District requested and was granted two extensions of time to conduct discovery to respond to City's motion for summary judgment. On June 20, 2008, after considering all of the evidence in the record, the trial court entered summary judgment in favor of the City and Developer. This appeal follows.

### Points Relied On

In its first point, School District claims that the trial court erred in granting summary judgment in favor of City and Developer because City did not establish a *prima facie* case that it was entitled to judgment as a matter of law in that it failed to establish that a predominance of blighting factors resulted in any of the resulting circumstances set forth in the TIF Act in light of the Redevelopment Area's present condition or use as a whole.

In its second point, School District maintains that the trial court erred in granting summary judgment in favor of City and Developer because genuine issues of material fact precluded summary judgment in that the pleadings, affidavits and discovery of record demonstrate that genuine issues of material fact exist relating to City's findings that the Redevelopment Area as a whole would not be subject to growth and development in the absence of TIF and the determination of the size and boundaries of the redevelopment area.

In its third point, School District asserts that the trial court erred in granting summary judgment in favor of City and Developer because genuine issues of material fact precluded summary judgment in that the pleadings, affidavits and discovery of record demonstrate that genuine issues of

material fact exist relating to the existence or absence of substantial evidence to support City's legislative findings.

In its fourth point, School District contends that the trial court erred in granting summary judgment in favor of City and Developer because genuine issues of material fact precluded summary judgment in that the pleadings, affidavits and discovery of record demonstrate that genuine issues of material fact existed relating to whether a portion of the Redevelopment Area consisted of property that would qualify as a "greenfield" which by statute is not subject to tax increment financing.

### Standard of Review

The propriety of summary judgment is purely an issue of law. *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo.banc 1993). Accordingly, the standard of review on appeal regarding summary judgment is no different from that which should be employed by the trial court to determine the propriety of sustaining the motion initially. *Id.* Summary judgment is designed to permit the trial court to enter judgment, without delay, where the moving party has demonstrated a right to judgment as a matter of law. *Id.*

Appellate review of a summary judgment is *de novo. ITT*, 854 S.W.2d at 376. Summary judgment is upheld on appeal if the movant is entitled to judgment as a matter of law and no genuine issues of material fact exist. *Id.* at 377. The record is reviewed in the light most favorable to the party against whom judgment was entered, according that party all reasonable inferences that may be drawn from the record. *Id.* at 376. Facts contained in affidavits or otherwise in support of a party's motion are accepted as true unless contradicted by the non-moving party's re-sponse to the summary judgment motion. *Id.*

A defending party may establish a right to judgment as a matter of law by showing any one of the following: (1) facts that negate any one of the elements of the claimant's cause of action; (2) the non-movant, after an adequate period of discovery, has not and will not be able to produce evidence sufficient to allow the trier of fact to find the existence of any one of the claimant's elements; or (3) there is no genuine dispute as to the existence of each of the facts necessary to support the movant's properly-pleaded affirmative defense. *Id.* at 381.

Once the movant has established a right to judgment as a matter of law, the non-movant must demonstrate that one or more of the material facts asserted by the movant as not in dispute is, in fact, genuinely disputed. *Id.* The non-moving party may not rely on mere allegations and denials of the pleadings, but must use affidavits, depositions, answers to interrogatories, or admissions on file to demonstrate the existence of a genuine issue for trial. *Id.*

### Discussion

#### Point I—Blight

In determining whether an area is blighted, and in approving a Redevelopment Plan, the Board acts in its legislative capacity. *JG St. Louis West Ltd. Liability Co. v. City of Des Peres*, 41 S.W.3d 513, 517 (Mo.App. E.D.2001). Judicial review of a legislative determination is limited to whether it was arbitrary or induced by fraud, collusion or bad faith or whether the Board exceeded its powers. *Id.*, see also *Crestwood Commons Redevelopment Corp. v. 66 Drive–In, Inc.*, 812 S.W.2d 903, 910 (Mo.App. E.D.1991). The issue of whether a legislative determination is arbitrary rests on the facts of each case. *Crestwood*

*Commons,* 812 S.W.2d at 910, *Allright Missouri v. Civic Plaza Redevelopment,* 538 S.W.2d 320, 324 (Mo. banc 1974). In determining whether the burden is met, it must be kept in mind that courts cannot interfere with a discretionary exercise of judgment in determining a condition of blight in a given area. *Crestwood Commons,* 812 S.W.2d at 910, *Allright Missouri,* 538 S.W.2d at 324. Unless it appears that the conclusion of the Board is clearly arbitrary, we cannot substitute our opinion for that of the Board. *Crestwood Commons,* 812 S.W.2d at 910, *Allright Missouri,* 538 S.W.2d at 324. If the Board's action is reasonably doubtful or even fairly debatable we cannot substitute our opinion for that of the Board. *Crestwood Commons,* 812 S.W.2d at 910, *Allright Missouri,* 538 S.W.2d at 324.

■ School District claims that the City failed to establish that a predominance of blighting factors set forth in the TIF Act resulted in any of the circumstances set forth in the TIF Act in light of the Redevelopment Area's present condition or use as a whole.

Section 99.805(1) of the TIF Act defines a blighted area as follows:

(1) "Blighted area", an area which, by reason of the predominance of defective or inadequate street layout, unsanitary or unsafe conditions, deterioration of site improvements, improper subdivision or obsolete platting, or the existence of conditions which endanger life or property by fire and other causes, or any combination of such factors, retards the provision of housing accommodations or constitutes an economic or social liability or a menace to the public health, safety, morals, or welfare in its present condition and use....

We find that the City presented ample evidence establishing that a predominance of blighting factors in the Redevelopment Area, namely (1) defective and inadequate street layout; (2) improper subdivision and obsolete platting; (3) deterioration of site improvements; and (4) unsanitary and unsafe conditions, has resulted in one of the circumstances set forth in the TIF Act, namely economic liability, in light of the Redevelopment Area's present condition or use as a whole. These voluminous factual findings are set forth *supra* in the Factual and Procedural Background portion of this opinion and will not be repeated here.

School District begins its argument by dividing the Redevelopment Area as a whole into parcels according to the parcel's position in the order of three phases of development, to-wit: Phase I is made up roughly of those parcels to the west of Allenton, generally consisting of approximately four hundred (400) acres described as the Wallach Farm property, which is the parcel within the School District; Phase II is made up of those parcels generally referred to as Allenton; and Phase III is made up of those parcels to the east of Allenton, including those properties along Main Street and Hunters Ford Road.

School District claims that the City's findings of defective or inadequate street layout are almost exclusively confined to the portions of the Redevelopment area that are scheduled to be developed in Phases I and II of the Redevelopment Plan, and that the findings as to the improper subdivision or obsolete platting factor apply exclusively to Phase II of the Redevelopment Plan, and that the lack of water and sanitary sewer systems and dumping of trash is confined to the Wallach Farm portion of the Redevelopment Area.

Such piecemeal analysis of the Redevelopment Area as a whole is not contemplated under the statute. School District's argument fails to analyze the Redevelopment Area *as a whole,* which is required by the statute. See Section 99.810.1(1). School District improperly divides the whole Redevelopment Area into separate parcels to bolster its argument that the City's findings of blight are factually unsupported. However, we find that the record is replete with specific and detailed factual descriptions of the problems with the streets, platting and subdivisions, in their present use, in the Redevelopment Area as a whole. School District does not put any of those factual findings in dispute.

School District also argues that the inadequate street layout and the improper or obsolete nature of the plats/subdivisions are evaluated in terms of the future uses of the property, and not in terms of their current uses, as is required by Section 99.805(1). Specifically, School District cites the CBB Study's findings that Wengler Road/Horneker Road "is also a light-duty, two-lane roadway that travels along rugged terrain to the south of Allenton, so it would not provide suitable access for *future* development without being substantially improved, reconstructed and/or realigned" and that "access to the Area is limited to three separate connections, all of which are incapable of accommodating *future* growth in the (Area)." School District also criticizes the future-focused conclusion of the Redevelopment Plan that, "[m]ost notable is the impaired accessibility of the Area from the interstate highway system due to the significant costs of reconstructing a bridge to safely traverse the railroad tracks (which separate the Area from the interstate) and adequately accommodate vehicular traffic *associated with a master-planned residential community and regional retail/commercial center*" and the City's findings of blight based on unsafe conditions on the Wallach Farm parcel due to excessive street slopes, which School District claims are just fine for the present agricultural use of Wallach Farm.

The number of findings in the CBB study and in the Redevelopment Plan as to the inadequacy of the street layout and the improper or obsolete nature of the plats/subdivisions in the Redevelopment Area *in terms of their present use* are considerable, and the occasional references to their inadequacy in terms of planned uses of the property do not minimize the present use findings, but are mere surplusage.

■ School District claims that the vacant house and outbuildings located on the Wallach Farm property constitute deteriorated site improvements only because the City purchased the property in 2003 and failed to upkeep the improvements. School District takes issue with the City's finding that this blight constitutes an economic liability, because the City owns this parcel, and approximately $1,022,070.00 of the Redevelopment Area's assessed value is impacted by the existence of this tax-exempt property. School District asserts that it contravenes the plain purpose of the TIF Act if a municipality can create blight merely through the purchase of the real estate in question which is subsequently allowed to remain vacant and non-income producing, and the City cannot boot-strap itself into a finding of blight by relying on a low taxable assessed value when that value is depressed due to the very fact that the property is tax-exempt as City owned real estate. To find otherwise would allow a municipality to bypass the requirements of the TIF Act by merely acquiring the property in question prior to instigating the TIF.

School District cites no legal authority that any of the above facts makes the City's findings of blight and economic liability invalid. School District cites no provision of the TIF Act that states if part of the Redevelopment Area is owned by the City, or if part of the Area is tax-exempt due to its being owned by the City, or if part of the Area has not previously been redeveloped by the City, then the City is estopped from asserting the area is an economic liability due to its conditions of blight. School District's criticism of the City's actions is simply irrelevant to the legality of the City's findings of blight and economic liability of the Redevelopment Area under the TIF Act. The issue of *why* site improvements have deteriorated or have continued to deteriorate is irrelevant under the TIF Act, and does not affect the fact that the improvements are, in fact, deteriorated, which is the only factual finding the TIF Act requires. See Section 99.805(1). School District's argument creates no issue of fact as to the City's findings of blight.

For all of the foregoing reasons, Point I is denied.

### Point II—But/For Test

■ The trial court's decision with regard to whether the redevelopment area has not been subject to growth and development through investment by private enterprise and would not reasonably be anticipated to be developed without the adoption of the redevelopment plan, known as the "but/for finding," is subject to the same standard of review as is the finding of blight. *JG St. Louis West*, 41 S.W.3d at 520. In reviewing the Board's decision, we make our own independent determination of whether the legislative body's decision was fairly debatable. *Id.* If the Board's decision is reasonably doubtful or fairly debatable, we will not substitute our opinion for that of the Board. *Id.* The burden of proof falls on the party challenging the Board's determination. *Id.*

The but/for test, contained in Section 99.810.1, provides in pertinent part:

No redevelopment plan shall be adopted by a municipality without findings that:

(1) The redevelopment area on the whole is a blighted area, a conservation area, or an economic development area, and has not been subject to growth and development through investment by private enterprise and would not reasonably be anticipated to be developed without the adoption of the redevelopment plan; ...

■ School District maintains that it is not necessary that the entire 938 acres be included in the Redevelopment Area in order to make the Redevelopment Project economically feasible. Additionally, School District claims that the portion of the Redevelopment Area most affected by the blighting factors, i.e., Allenton, was previously the subject of a development known as the St. Louis MegaMall (MegaMall), which the City disapproved.

Appellant's first argument again mistakenly analyzes the issue by not considering the Redevelopment Area as a whole, as is required by Section 99.805(1). Further, the City presented uncontroverted evidence that after the establishment of the former TIF districts in 1996 and 1997, the City solicited several development proposals, which encountered significant extraordinary costs of development that made the developments economically infeasible within the former TIF districts. In 2005, in order to carry the costs necessary for redevelopment, the City determined that a larger redevelopment area, with more development activity, was necessary. The City presented evidence that despite numerous attempts to redevelop previous

portions of the Redevelopment Area as a business park, outlet mall and power center, there had been little to no private investment in the Area.

Appellant's argument that the portion of the Redevelopment Area most affected by the blighting factors, Allenton, was previously the subject of the MegaMall development, which the City disapproved, fails to take into consideration that the MegaMall project was itself a TIF project, and not a privately funded development, which is what the but/for test considers, i.e., whether or not the Redevelopment Area has been subject to growth and development through investment by private enterprise.

School District also accuses the City of attempting to shift the financial burden for the redevelopment of Allenton to the School District, which is a neighboring taxing authority. As such, asserts School District, the inclusion of the Wallach Farm property in the Redevelopment Area, is arbitrary and capricious.

■ Again, in giving plain meaning to the TIF statute, we are to consider the Redevelopment Area as a whole in making the but/for analysis. *JG St. Louis West,* 41 S.W.3d at 520. The plain words of the TIF statute do not permit the piecemeal examination of the entire Redevelopment Area when applying the but/for test, or the blighting analysis, for that matter. School District persistently examines the Redevelopment Area in this manner, which is not appropriate under the provisions of the TIF Act.

Furthermore, School District's arguments as to the motives of the City in fashioning the Redevelopment Area are irrelevant, and do not create any issues of fact as to the uncontroverted evidence presented by the City showing that the Redevelopment Area as a whole is blighted in many relevant and significant aspects, has not been subject to growth and develop-

ment through investment by private enterprise, and would not be economically feasible without TIF.

For the foregoing reasons, Point II is denied.

### Point III—Fairly Debatable Test v. Summary Judgment Standard

In determining whether an area is blighted and in approving the Redevelopment Plan, the Board acts in its legislative capacity. *JG St. Louis West,* 41 S.W.3d at 520, *Crestwood Commons,* 812 S.W.2d at 910. Judicial review of a legislative determination is limited to whether it was arbitrary or induced by fraud, collusion or bad faith or whether the Board exceeded its powers. *JG St. Louis West,* 41 S.W.3d at 520, *Crestwood Commons,* 812 S.W.2d at 910. In reviewing the trial court's decision, we make our own independent determination of whether the legislative body's decision was fairly debatable. *JG St. Louis West,* 41 S.W.3d at 520, *Hoffman v. City of Town and Country,* 831 S.W.2d 223, 225 (Mo.App. E.D.1992). If a Board's decision is reasonably doubtful or fairly debatable, we will not substitute our opinion for that of the Board. *JG St. Louis West,* 41 S.W.3d at 520, *Crestwood Commons,* 812 S.W.2d at 910. The burden of proof falls on the party challenging the Board's determination. *JG St. Louis West,* 41 S.W.3d at 520, *Maryland Plaza Redevelopment Corp. v. Greenberg,* 594 S.W.2d 284, 287 (Mo.App. E.D.1979).

■ School District maintains that this standard of review, as set forth above, conflicts with the standard of review for summary judgment, and therefore summary judgment is not appropriate in this case.

We appreciate School District's argument that theoretically, when a non-movant responds to a motion for summary

judgment in a case like the one *sub judice*, by setting forth disputed issues of material fact, that the non-movant still loses because those very disputed issues of fact merely create a debatable issue, which must be resolved in the Board's favor. However, in the instant case, School District has not, in fact, set forth any disputed issues of material fact, but rather, only disputed legal conclusions and arguments as to such things as motive that are irrelevant to the legality of the City's findings of blight and economic liability of the Redevelopment Area under the TIF Act.

The City has set forth very detailed specific findings of fact as to the conditions of blight in the Redevelopment Area. Whether, under the statute, the conglomeration of these facts constitute blight, is a legal conclusion under the TIF statute to be made by the Board. Such legal conclusion, if fairly debatable, will not be disturbed by this Court. School District disputes the legal conclusion of blight, but does not actually put any of the factual findings of blight into issue.

School District similarly disputes the legal conclusion of whether the Redevelopment Area as a whole would be privately developed without the aid of TIF. However, again, School District does not put any of the facts that support the City's conclusion that it would not be so developed into issue. School District attempts to present evidence that could support a finding that the Redevelopment Area would be privately redeveloped, but that evidence does not contradict the City's factual findings. Rather, School District's evidence that part of the Redevelopment Area was once

attempted to be developed through the MegaMall project merely attempts to suggest that the issue is fairly debatable, and fails in that regard in any event.

School District also takes issue with the City's finding that the factual findings of blight constitute an economic liability. However, this finding is a legal conclusion, not a factual finding, for which we defer to the City if that finding is fairly debatable.

School District greatly relies upon language in *Great Rivers Habitat Alliance v. City of St. Peters*, 246 S.W.3d 556, 563–564 (Mo.App. W.D.2008), to the effect that summary judgment was inappropriate where evidence offered by testifying evidence had not been presented. However, in the instant case, the evidence of the experts, PGAV and CBB, was considered by the trial court. This evidence is set out at length in the Factual and Procedural Background portion of this opinion. When the City moved for summary judgment based on this evidence, it became School District's burden to put the facts comprising the evidence into dispute. School District failed to carry its burden.[4] Therefore, because there were no disputed issues of material fact supporting the City's ultimate findings of blight, economic liability and satisfaction of the but/for test, the City was entitled to judgment as a matter of law. School District's reasons for why it disputes these ultimate findings do not create any issues of fact, but only show that the City's conclusions are fairly debatable.

For these reasons, Point III is denied.

4. By contrast, in *Great Rivers*, the Court determined that the movant City failed to assert that "the Area suffers from 'defective or inadequate street layout … in its present condition and use'" and therefore did not establish a prima facie case for its argument regarding the street layout, and the entry of summary judgment for that reason would be error. *Id.* at 564. Such is not the case here, where the City presented ample evidence of the inadequacy of the streets in the Redevelopment Area, as well as ample evidence of other varieties of blight.

*Point IV—"Greenfield"*

 School District maintains that there is a disputed issue of fact as to whether a portion of the Redevelopment Area, specifically the Wallach Farm property, consists of property that would qualify as a "greenfield" area, which by statute is not subject to TIF.

Section 99.843 provides as follows:

Notwithstanding the provisions of sections 99.800 to 99.865 to the contrary, no new tax increment financing project shall be authorized in any greenfield area, as such term is defined in section 99.805, that is located within a city not within a county or any county subject to the authority of the East–West Gateway Council of Governments. Municipalities not subject to the authority of the East–West Gateway Council of Governments may authorize tax increment finance projects in greenfield areas.

Section 99.843 became effective on November 28, 2007, and provides a prohibition on *new* TIF projects. The TIF project at issue was instituted and authorized in 2005, before the enactment and effective date of Section 99.843. Therefore the project at issue is not a new TIF project governed by Section 99.843. Accordingly, Point IV is without merit and therefore denied.

*Conclusion*

The trial court's judgment is affirmed.

ROBERT G. DOWD, JR., P.J., and CLIFFORD H. AHRENS, J., concur.