GREAT RIVERS HABITAT
ALLIANCE, et al.,
Appellants,

v.

CITY OF ST. PETERS,
et al., Respondents.

Nos. WD 74328, WD 74330.

Missouri Court of Appeals,
Western District.

Aug. 28, 2012.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Oct. 2, 2012.

Application for Transfer Denied
Dec. 18, 2012.

Robert D. Blitz, Marc H. Ellinger, and Christopher O. Bauman, St. Louis, MO, Joann Leykam, St. Charles, MO, for Appellants.

David T. Hamilton and Matthew J. Fairless, St. Charles, MO, Michael T. White, Kansas City, MO, for Respondent City of St. Peters, MO.

Chris Koster, Attorney General, Kevin Hall, Assistant Attorney General, Jefferson City, MO, for Respondent Attorney General.

Before Division II: JOSEPH M. ELLIS, Presiding Judge, and ALOK AHUJA and MARK D. PFEIFFER, Judges.

MARK D. PFEIFFER, Judge.

This is a case challenging the adoption of tax increment financing for a 1,640–acre tract of land in the City of St. Peters, Missouri, by the City of St. Peters. Great Rivers Habitat Alliance ("GRHA"); The Adolphus A. Busch Revocable Living Trust, Adolphus A. Busch, Trustee ("Trust"); Andrew Riney; Delores J. Wetzel; Randy F. Hudson; Allen C. Poggemoeller ("Individual Appellants"); and St. Charles County, Missouri ("County") (collectively, "Appellants"), appeal from the Judgment of the Circuit Court of Cole County, Missouri ("trial court"), in favor of the City of St. Peters, Missouri ("City"), and the Missouri Attorney General ("AG"), following a four-day bench trial of Appellants' action for declaratory judgment, injunctive relief, and judicial review, in which they challenged the adoption of tax increment financing for a 1,640–acre tract of land in the City and the constitutionality[1] of the Real Property Tax Increment Allocation Redevelopment Act, §§ 99.800 to 99.865[2] ("TIF Act"). We affirm.

## TIF Act

■ "Tax increment financing, in general, is the statutory mechanism for public financing of private redevelopment projects with the goal that the projects will generate tax revenues that exceed the revenues before the redevelopment." *City of St. Charles v. State*, 165 S.W.3d 149, 151 (Mo. banc 2005). The TIF Act authorizes a municipality to approve redevelopment plans and redevelopment projects and to designate redevelopment project areas upon the recommendation of the munici-

---

1. As we explain more fully in our discussion of Points II and III, Appellants have more specifically challenged the constitutional application of the TIF Act and not the constitutional validity of any statutes associated therewith.

2. All statutory references are to RSMo 2000, unless otherwise indicated.

pality's tax increment financing commission. § 99.820. The TIF Act specifies the required contents of the redevelopment plan and the required findings a municipality must make in the ordinance adopting a redevelopment plan, including that:

> [t]he redevelopment area on the whole is a blighted area … and has not been subject to growth and development through investment by private enterprise and would not reasonably be anticipated to be developed without the adoption of tax increment financing[,] … [and that t]he redevelopment plan conforms to the comprehensive plan for the development of the municipality as a whole[.]

§ 99.810.1(1) & (2).

If a municipality provides for tax increment allocation financing, the county assessor determines the total equalized assessed value of all taxable real property within the redevelopment project and certifies such amount as the total initial equalized assessed value of the taxable real property within the project. § 99.855.1. Every year that tax increment allocation financing is in effect, the county assessor ascertains the current equalized assessed value of the property in the redevelopment project, and the increases over the initial equalized assessed value are subject to payments in lieu of taxes ("PILOTs"). § 99.855.2; § 99.805(11). Those PILOTs are deposited into a special allocation fund. § 99.805(16). Additionally, fifty percent of the additional economic activity taxes ("EATs") generated by the redevelopment are deposited into a separate segregated account within the special allocation fund. § 99.845.2. The county collector collects the PILOTs and the EATs and pays for redevelopment project costs or to retire obligations issued to pay project costs, with the surplus paid to the respective affected taxing districts. § 99.835; § 99.845.

**Factual and Procedural Background**

On December 13, 1991, the City adopted a Comprehensive Plan ("1991 Plan") to guide the future growth and development of the City in a coordinated and unified manner. It was intended to be "a continually changing document designed to reflect the latest growth and development strategies of the City." The 1991 Plan stated that the City should focus its attention on future annexations of selected areas having the potential for commercial and industrial growth in order to broaden the tax base of the City. The "Future Land Use" map of the 1991 Plan shows the planned use north of the City was primarily industrial and commercial with the northernmost part agricultural.

In 1992, the City annexed an area located in the northern part of the City, generally bounded by Spencer Creek to the west, Dardenne Creek to the north, the city limits of the City to the east, and the Norfolk Southern Railroad to the south, containing approximately 1,640 acres, excluding rights-of-way ("Redevelopment Area" or "Area"). At that time, the Area was primarily used for agriculture.

In 1993, the entire Area was flooded by overflow from the Mississippi River. During the 1993 flood, the farmhouses owned by the largest landowner in the area, William Fienup, were destroyed, and his entire farm was covered with floodwater. The roads on his farm were impassable, and his crops were destroyed.

On January 27, 1994, the City adopted a "mid-course correction" planning document as a supplement to and to be used in conjunction with the 1991 Plan ("1994 Supplement") "to recognize changing trends" and to provide updated information for physical, social, cultural, and economic fac-

tors affecting the City. The 1994 Supplement anticipated "[a]dditional industrial areas ... primarily to the north of the City." In the "Future Land Use" map of the 1994 Supplement, the planned use of the Area was the same as in the 1991 Plan—industrial, commercial, and agricultural.

In 1995, a record rainfall resulted in flooding from the Mississippi River into the Area, scouring the soil and covering crops in the Area's farmland with three feet of flood waters. Mr. Fienup estimated that he lost tens of thousands of dollars as a result of the flooding. Mr. Fienup further testified that he never again managed to net a profit from farming operations—instead, he lost well over $100,000 of additional dollars from farming operations over the next four years until he finally sold his land to the City.

In 1996, Missouri Highway Route 370 was constructed as a freeway transecting the Area. The City retained Burns & McDonnell to conduct an engineering study of the Area's internal drainage system and internal flooding problems and to submit a flood protection report ("1996 Study"). The 1996 Study concluded that:

The entire study area is located in the Mississippi River floodplain and is subject to flooding from that stream as well as tributary streams in the area. The area is provided some degree of protection by existing agricultural levees which flank each of the tributary streams. The existing levees were not able to provide protection from the 1993 Mississippi River flood which exceeded that stream's 100–year flood elevation of 443 feet.

In 1998, the spring rainfall was ten inches above normal. According to Mr. Fienup, the drainage ditch system and pumps on his farm were insufficient to get the water off his crops in time to prevent crop devastation. Given the continuing and persistent flooding problems with his land and resulting economic hardships, Mr. Fienup decided to sell his property to the City for $4339 per acre. The City purchased other floodplain property for $7500 per acre. Also in 1998, Grand Slam Golf purchased 61 acres of farmland in the southwest corner of the Area to develop a Tour 3 Golf Course with practice greens, practice holes, and a driving range. The golf course's developer and operator testified that he encountered numerous and significant land use difficulties in operating the golf course, particularly drainage issues, since an inch or two of rain would cause the course to flood—which often happened. The golf course business never operated profitably and the developer eventually sold the land.

In February 1999, the City retained Sverdrup Civil Inc. ("Sverdrup") to prepare a feasibility report analyzing the extent of flooding in the Area, alternatives for providing flood protection by constructing a levee, and a levee location recommendation.

In April 1999, the City retained Development Strategies, Inc. ("DSI") to undertake a market evaluation; develop a land use/concept plan ("Land Use Plan") for the Area, incorporating information from Sverdrup regarding how a drainage system and other infrastructure systems could be integrated into the Land Use Plan to support the type of development proposed; and prepare a TIF plan, using the Land Use Plan as a basis for the TIF plan.

In June 1999, Sverdrup's preliminary levee feasibility study was presented to the City Board of Aldermen ("Board"), and the Board selected the intermediate protected area 500–year levee option at an estimated cost of $80 million, placing the levee alignment about midway between Route 370

and Dardenne Creek, thereby providing a developable tract of land.

On October 5, 1999, DSI presented the "St. Peters Route 370 Tax Increment Financing (TIF) Redevelopment Plan" ("Redevelopment Plan" or "Plan") to the St. Peters' Tax Increment Financing Commission ("TIF Commission") for consideration. The TIF Commission was informed that the City had options to purchase 1,100 of the 1,640 acres of the proposed Area; that land for industrial development in the City was practically nonexistent; that the costs of infrastructure were such that private redevelopment of the Area was considered impossible; that although the City planned on seeking voter approval for general obligation bonds to finance some of the improvements, TIF was desired to assist in covering the debt service on the bonds; and that because the depth of the floodplain in the Area where the flooding in 1993 was fifteen- to eighteen-feet deep, development would not occur without flood protection. The Plan identified certain conditions in the Redevelopment Area that qualified the Area as blighted. The Plan also identified other deficiencies contributing to the lack of private investment for redevelopment, including:

- the cost of flood protection for the land to be developed;
- the cost of internal stormwater drainage;
- the cost of improvements necessary to provide improved access; and
- the cost of providing necessary utilities that would accommodate development.

The Plan concluded that the Redevelopment Area met the requirements for designation as a "blighted area" under the TIF Act and described certain redevelopment projects for basic infrastructure improvements in the Area, including construction of a 500–year levee, stormwater detention/retention areas and pumps to drain the levee-protected area, and access and circulation improvements ("Project"), and estimated the associated costs at $131,092,500. On November 23, 1999, the TIF Commission held a public hearing with regard to the Plan in conformance with sections 99.820.4, 99.825.1, and 99.830. After the hearing, the TIF Commission approved the Plan.

On December 1, 1999, the City adopted DSI's Land Use Plan as the 1999 update ("1999 Update") to the 1991 Comprehensive Plan and 1994 Supplement (collectively, "Comprehensive Plan"). The 1999 Update proposed a mixed-use development for the Area, with primary emphasis on distribution, office, warehouse, and manufacturing uses. The 1999 Update noted that because the entire Area is within the 100–year floodplain of the Mississippi River, the proposed uses would not be viable unless flood protection was provided. The 1999 Update recommended access and circulation improvements and other basic infrastructure improvements, including a new levee,[3] a stormwater drainage system, and additional utilities.

On December 16, 1999, after considering the recommendation forwarded by the TIF Commission and the information in the Plan concerning the blighted nature of the Area, the Board enacted Ordinance 3156, finding that:

- the Redevelopment Area as a whole was a blighted area as defined in section 99.805(1) of the TIF Act;
- the Area had not been subject to growth and development through private investment and would not reason-

---

**3.** The evidence presented at trial reflected that the existing private agricultural levees were so poorly maintained that some areas of these agricultural levees allowed water to flow in as easy as it could flow out.

ably be anticipated to be developed privately without the adoption of TIF and the Redevelopment Plan;

- growth and development of the Area as a whole was hampered by the difficulties and expense of providing flood protection to the Area, the cost of internal stormwater drainage, the cost of improvements necessary to provide access, and the costs of providing necessary utilities to accommodate development; and
- the Plan and Project conformed to the Comprehensive Plan for development of the City as a whole.

The Board designated the Redevelopment Area and adopted and approved the Redevelopment Plan and Project.

In the opinion of the City's Assistant City Administrator, Timothy Wilkinson, in December 1999, the City did not have the financial ability to finance the Project to build the 500–year levee and infrastructure in the Area "without the use of TIF" because the Project "was too big, too big of an undertaking, too many dollars." According to Wilkinson, the City could have phased bond issues totaling $35 million "to get the [P]roject started, ... under the anticipation that we would be reimbursed by the PILOTs and EATs that are generated by the [P]roject." On January 13, 2000, the Board enacted Ordinance 3166. The ordinance called for a bond election in the City to borrow $35 million for the purpose of acquiring land necessary for and to be protected by, and for the construction of, a levee and related improvements. Such borrowing would be evidenced by the issuance of general obligation bonds ("GO Bonds"). At the April 4, 2000 election, the bond issue passed.

Thereafter on July 27, 2000, the Board enacted Ordinance 3271, adopting TIF for the Redevelopment Area, authorizing im-

plementation of the Redevelopment Plan, and creating the special allocation fund.

The GO Bonds were issued in phases: on July 27, 2000, the Board enacted Ordinance 3272 authorizing the issuance of $10 million of GO Bonds; on February 14, 2002, the Board enacted Ordinance 3592 authorizing the issuance of $2.5 million of GO Bonds; and on August 12, 2004, the Board enacted Ordinance 4094 authorizing the issuance of $22.5 million of GO Bonds. All of the GO Bonds were the general obligations of the City, but the principal of and interest on the GO Bonds were also payable from the funds available in the TIF special allocation fund as provided in Ordinance 3271.

On June 9, 2005, the Board enacted Ordinance 4291, approving the execution of a Joint Development Agreement with a private redeveloper.

In 2005, GRHA, the Trust, and the Individual Appellants filed a Petition for Declaratory Judgment, Injunctive Relief, and Judicial Review. The County was not named a party to the action but obtained leave to intervene. Thereafter, Appellants filed an eleven-count Joint Amended Petition for Declaratory Judgment, Injunctive Relief, and Judicial Review ("Joint Amended Petition"), which included challenges to Ordinances 3156 and 4291 as violative of the TIF Act and challenges to the constitutionality of the TIF Act. The City filed a motion for summary judgment, which was granted. The Appellants appealed to this court, which reversed the trial court's grant of summary judgment and remanded the case to the trial court. *Great Rivers Habitat Alliance v. City of St. Peters*, 246 S.W.3d 556 (Mo.App. W.D.2008) ("*GRHA I*"). After a four-day bench trial, the trial court entered judgment in favor of the City and the AG on all claims in the Joint Amended Petition. The Appellants appeal, asserting six points of error.

## Point I—Statutory Challenge—
## Legislative Findings

In their first point on appeal, Appellants assert that the trial court erred in holding that substantial evidence supported the City's legislative findings: that the Area was "blighted" (§ 99.805(1)); that "but/for" the adoption of TIF, the Area would not reasonably be anticipated to be developed (§ 99.810.1(1)); and that the Redevelopment Plan conformed to the Comprehensive Plan for the development of the municipality as a whole (§ 99.810.1(2)).

## Standard of Review[4]

■ "[D]isputes over the propriety of a municipality's legislative findings are to be resolved by application of the 'fairly debatable' test." *GRHA I*, 246 S.W.3d at 562 (citing *City of St. Joseph v. Hankinson*, 312 S.W.2d 4, 8 (Mo.1958)). Under that test, the appellate court will not substitute its discretion for that of the legislative body; instead, it will review the legislative action to determine whether a sufficient showing of reasonableness exists so that the question is, at the least, fairly debatable. *Id.* If such a showing is made, then the discretion of the legislative body is conclusive. *Id.* In order to overcome the presumption of legislative validity and prevail on a claim that legislative action is unreasonable, arbitrary, or capricious, the challenger must show that the challenged action is not "reasonably doubtful or even fairly debatable." *Id.* (internal quotation omitted). Reasonableness or arbitrariness turns upon the facts of each case, and judicial review focuses on whether substantial evidence supports the municipal legislative determination. *Id.* (citing *Centene Plaza Redevelopment Corp. v. Mint Props.*, 225 S.W.3d 431, 433 (Mo. banc 2007)).

■ "In determining whether an area is blighted, and in approving a Redevelopment Plan, the Board acts in its legislative capacity." *Meramec Valley R–III Sch. Dist. v. City of Eureka*, 281 S.W.3d 827, 835 (Mo.App. E.D.2009). "Judicial review of a legislative determination is limited to whether it was arbitrary[;] or induced by fraud, collusion or bad faith[;] or whether the Board exceeded its powers." *Id.*[5] "[C]ourts cannot interfere with a discretionary exercise of judgment in determining a condition of blight in a given area." *Id.* at 836. "The issue of whether a legislative determination is arbitrary rests on the facts of each case." *Id.* at 835. And the burden of proving that it is arbitrary is upon the party so charging. *See id.* Even if the Board's action is reasonably doubtful or even fairly debatable, unless the conclusion of the Board is clearly arbitrary, we cannot substitute our opinion for that of the Board. *Id.* at 836. A legislative decision is arbitrary only if it "is so erroneous as to not be fairly debatable." *Ohmes v. Lanzarini*, 720 S.W.2d 425, 426 (Mo.App. E.D.1986) (citing *Binger v. City of Independence*, 588 S.W.2d 481, 485 (Mo. banc 1979)). "Even where evidence contrary to the legislative determination appears stronger than the evidence supporting it, so long as substantial evidence exists on both sides, then the question is fairly de-

---

4. We note that when a trial court has reviewed the propriety of a decision by a legislative body, it has not acted as a trier of fact; therefore, the *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976), standard does not apply to our review. *Binger v. City of Independence*, 588 S.W.2d 481, 486 (Mo. banc 1979). Rather, we examine the record to determine whether substantial evidence supports the legislative decision. *Id.*

5. In this case, Appellants do not contend that the Board's blight determination was induced by fraud, collusion, or bad faith; therefore, we limit our review to whether the legislative determination was arbitrary.

batable, requiring us to defer to the legislative determination of blight." *Land Clearance for Redevelopment Auth. of City of St. Louis v. Inserra*, 284 S.W.3d 641, 646 (Mo.App. E.D.2009).

## Analysis

### Blight Finding

■ One of the findings required to be made by the municipality before adopting a redevelopment plan is that the "redevelopment area on the whole is a blighted area." § 99.810.1(1). The TIF Act defines a "blighted area" as:

> an area which, by reason of the predominance of defective or inadequate street layout, unsanitary or unsafe conditions, deterioration of site improvements, improper subdivision or obsolete platting, or the existence of conditions which endanger life or property by fire and other causes, or any combination of such factors, retards the provision of housing accommodations or constitutes an economic or social liability or a menace to the public health, safety, morals, or welfare in its present condition and use[.]

§ 99.805(1). Thus, an area is blighted if the "predominance of" an enumerated factor or factors:

- defective or inadequate street layout, or
- unsanitary or unsafe conditions, or
- deterioration of site improvements, or

- improper subdivision or obsolete platting, or
- the existence of conditions which endanger life or property by fire and other causes, or
- any combination of such factors,

leads to any of the enumerated resulting circumstances:

- retards the provision of housing accommodations, or
- constitutes an economic or social liability, or
- [constitutes] a menace to the public health, safety, morals, or welfare,

all of which must be considered in light of the "present condition and use" of the area. *GRHA I*, 246 S.W.3d at 560 (quoting § 99.805(1)).

For purposes of our appellate review, then, if there is substantial evidence supporting a conclusion that the legislative action is "fairly debatable" on the topic of (1) the existence of *any* of the blight factors (2) leading to the existence of *any* of the TIF Act's enumerated blight results, we must affirm the municipality's finding that the land is "blighted."

### Blight Factors:

In part, both the Board and the trial court concluded that there was substantial evidence that the Redevelopment Area was blighted due to unsafe or unsanitary conditions[6] and conditions endangering life or property.[7] We agree that there was sub-

---

6. Appellants argue that the City did not, in fact, rely upon "unsafe or unsanitary conditions" as a blight factor; yet, this argument is belied by the Plan, which clearly identified "unsafe conditions" of the Redevelopment Area as a blight factor—discussing in detail the flooding conditions that endangered the Redevelopment Area.

7. Appellants defend this contention by arguing that the TIF Act blight factor relating to property endangerment requires "the existence of conditions which endanger life or

property by fire *and* other causes," thus suggesting that flooding which endangers life or property in the Redevelopment Area is only a blight factor if the flooding was *in addition to* fire endangering the same life or property. Aside from ignoring the TIF Act's catchall provision referencing "any combination of such factors," the Appellants' interpretation of the TIF Act blight factor language leads to an absurd result. "The primary rule of statutory construction is to ascertain the intent of the legislature from the language used, to give

stantial evidence supporting these conclusions.

At trial, evidence was adduced that: the Redevelopment Area was in a 100–year floodplain; it flooded in 1973, 1993, and 1995; it frequently flooded from the Dardenne Creek; and flooding on the Dardenne Creek was increasing—in large part due to an unmaintained and wholly inadequate levee and drainage system in the Redevelopment Area.

City Administrator Charnisky testified that the Redevelopment Area was prone to flooding, becoming an undesirable, unusable, and unsanitary area with mosquitoes and dead fish in the bottoms. When there was more than a couple of inches of rain, the water would pond and stand for an extended period of time because of a lack of drainage. He testified that prior to 1999, a golf course clubhouse in the Redevelopment Area was underwater due to flooding, a farmhouse was abandoned due to flooding, another farmhouse had to be elevated above the ponding water, and other small structures and land were rendered useless because of flooding and associated scouring of the land. Mr. Charnisky confirmed that flooding occurred in the Redevelopment Area when the Missouri River and its tributaries drain into the Mississippi River, and the entire regional natural draining system is surcharged to capacity, endangering life and property.

City Director of Engineering Yerion also testified that in the 1993 flood all of the ingress and egress lanes in the Redevelopment Area were underwater—with eight feet of water at the bottom of the bluffs and fifteen feet of water closer to Dardenne Creek.

Gary Hoette, an agronomist, testified that in forming his expert opinion as to the usefulness of the land in the Redevelopment Area, he relied upon the 1999 Sverdrup study's findings that the Area was subject to flooding and contained a highly plastic soil. He also relied on the National Soil Conservation Service soil survey, which classified the soil of the Area as portage soil (extremely flat and readily ponds water, which chokes and kills crops). He consulted climate data that quantified the rainfall in the Area as thirty-five to forty inches per year. Mr. Hoette concluded that the land in its present state in the Area was unsafe and useless because of the characteristics of portage soil, increased runoff, and being subject to flooding from the Mississippi River. Mr. Hoette noted that even when the flood waters recede, unsafe and un-

effect to the intent if possible, and to consider the words in their plain and ordinary meaning." *Murray v. Mo. Highway & Transp. Comm'n*, 37 S.W.3d 228, 233 (Mo. banc 2001) (internal quotation omitted). Statutes should be construed in such a way as to avoid unreasonable or absurd results. *Id. See also Hurley v. Eidson*, 258 S.W.2d 607, 608–09 (Mo. banc 1953) ("But it is certain 'or' is often interpreted to mean 'and' and vice versa, if the context shows that meaning was intended, or when, as said, an absurd consequence, or frustration of the object of the enactment, would otherwise follow."); *Hawkins v. Hawkins*, 511 S.W.2d 811, 813 (Mo.1974) (noting Missouri authorities on the interchangeability of the words "and" and "or"). Here, the object of the TIF Act was to identify negative conditions endangering life or property, specifically delineating "fire" as a nonexclusive example of the sort of property pestilence intended within the scope of the TIF Act blight factor analysis. It cannot reasonably be suggested that "flooding" was not contemplated by the language of the TIF Act. Irrespective, however, as we note in our ruling today, the flooding described in the evidence of this case separately caused "unsanitary and unsafe conditions" *in addition to* "life or property endangerment"; thus, even were we to disregard the "life or property endangerment" blight factor, there remains ample evidence supporting the "unsanitary and unsafe conditions" blight factor.

sanitary conditions result because the water brings in sand and trash.

Larry Marks, the primary author of the Plan, testified that flooding results in crop destruction, road erosion, and disease.

The testimony of Mr. Charnisky, Mr. Yerion, Mr. Hoette, and Mr. Marks constituted substantial evidence that one or more blight factors predominated in the Area. Because the Appellants have not established that the Board's action was clearly arbitrary and unreasonable, we will not substitute our opinion for that of the Board. *Riggins v. City of Kansas City*, 351 S.W.3d 742, 756 (Mo.App. W.D.2011).[8]

**Blight Results:**

Relying principally upon the blight factor of "unsanitary or unsafe conditions," the Board and the trial court concluded that the corresponding result of this blight factor was a property condition constituting a "menace to the public health, safety, or welfare." Again, we agree that there was substantial evidence in the record supporting this conclusion.[9]

Apart from case law recognizing that flooding constitutes a menace to public health, safety, or welfare,[10] and the testimonial admission of Individual Appellant Wetzel, who agreed that "flooding does adversely impact public health, safety and welfare," Plan author Marks additionally testified that because disease is associated with flooding, and the entire area is impacted by flooding conditions, the Area constituted a menace to public health, safety, or welfare. Marks related the "menace" circumstance to health and safety issues: where water is not adequately draining, health issues exist because of the stagnant waters.

Therefore, we find that the Board's legislative action was reasonable and fairly debatable. Substantial evidence supported the Board's legislative finding that the Area, in its present condition and use in 1999, suffered from a predominance of conditions resulting in the Area constituting a menace to the public health, safety, or welfare.

## But/For Finding

■ In addition to a finding of blight, the TIF Act requires that a municipality must find that the redevelopment area has not been subject to growth and development through investment by private enterprise and would not reasonably be anticipated to be developed without the adoption of tax increment financing. § 99.810.1(1). This finding is often referred to as the "but/for" finding. *GRHA I*, 246 S.W.3d at

---

8. Absent from the discussion of our ruling today is any suggestion that the nature of agricultural land is such that it is not capable of being deemed blighted. The parties to this case all concede that, in the context of this case, agricultural land is capable of suffering from the type of blight contemplated by the statutory scheme authorizing tax increment financing. Thus, we need not and do not address that issue.

9. There was also substantial evidence in the record to support the Board's and the trial court's additional conclusion that "economic liability" resulted from the blight factors previously enumerated. Due to flooding and portage soil conditions in the Redevelopment Area, Mr. Fienup testified to the virtual impossibility of profiting from farm operations in the Area, noting specific examples of net losses from farming operations in each of the years 1995 through 1999. Nonetheless, because the TIF Act only requires substantial evidence to support any one or more "blight results," we confine the bulk of our discussion on this topic to evidence relating to the "menace to public health, safety, or welfare."

10. *See Drainage Dist. No. 48 of Dunklin Cnty. v. Small*, 318 S.W.2d 497, 502 (Mo. banc 1958); *Morrison v. Morey*, 146 Mo. 543, 48 S.W. 629, 633 (1898); *Applegate v. Franklin*, 109 Mo.App. 293, 84 S.W. 347, 350 (1904).

561. "Unlike the blight finding, the but/for finding required by section 99.810 does not focus exclusively on the Area's present condition and use. Instead, the but/for finding requires that a municipality assess whether an area would 'reasonably be anticipated to be developed without the adoption of tax increment financing.'" *Id.* at 566 (quoting § 99.810.1(1)). Whereas a blight finding demonstrates the need for redevelopment, a but/for finding demonstrates the need for a TIF designation in order to accomplish that redevelopment. *Id.*

The Plan identified factors contributing to the lack of private investment for redevelopment, including:
- the cost of flood protection for the land to be developed;
- the cost of constructing internal stormwater drainage systems;
- the cost of improvements necessary to provide improved access; and
- the cost of providing necessary utilities that would accommodate development.

The Plan stated that "[w]ithout major infrastructure investment, the [Area] will not develop." The Plan was "proposed as a means of funding a portion of these extraordinary public infrastructure improvements and other eligible project costs."

City Administrator Charnisky testified that the extraordinary development costs associated with redeveloping the area included construction of a levee and related pump stations, a total redevelopment drainage system and hydrology, and installation of water, sewer, electric, and gas utilities, for an estimated total redevelopment cost of $131,092,500.

Plan author Marks testified that between 1991 and 1996 when Route 370 was built, the property remained unprofitable agricultural land, and there was no private development in the area. Between 1996 and 1999, the only private development in the Area was a par–3 golf course that never operated at a profit. Mr. Marks further testified that in making his blight determination, he considered the conditions existing at the time he was preparing the Plan and then determined that development would not occur in the Area without TIF to finance the flood protection and infrastructure improvements. He opined:

> Given the magnitude of the improvements that needed to be made ... a private entity cannot carry and then be able to sell or develop a property that has this 131–million–dollar price tag.... In my opinion, without the use of TIF to help meet the entire package requirements, the costs, this project wouldn't be done. You need TIF to make this work.

In his opinion, "the [A]rea would not be subject to growth and development without TIF."

As set out in the Factual and Procedural Background section of this opinion, Assistant City Administrator Wilkinson testified that, in his opinion, in December 1999, the City did not have the financial ability to finance the Project to build the 500–year levee and infrastructure in the Area "without the use of TIF'" because the Project "was too big, too big of an undertaking, too many dollars." According to Mr. Wilkinson, the City could have phased bond issues totaling $35 million "to get the [P]roject started, ... under the anticipation that we would be reimbursed by the PILOTs and EATs that are generated by the [P]roject." All of the GO Bonds were the general obligations of the City, but the principal of—and interest on—the GO Bonds were also payable from the funds available in the TIF special allocation fund as provided in Ordinance 3271.

In light of our standard of review, we conclude that the Board's legislative find-

ing in December 1999 that the Redevelopment Area had not been subject to growth and development through investment by private enterprise and was not reasonably anticipated to be developed without the adoption of tax increment financing was, at minimum, fairly debatable.[11] Thus, Appellants have not met their burden of proving that the Board's legislative finding was arbitrary. We will not substitute our discretion for that of the Board.

### Conformity Finding

Finally, the TIF Act requires that a municipality must find that the redevelopment plan conforms to the comprehensive plan for the development of the municipality as a whole. § 99.810.1(2). "Under Section 99.810.1(2), the plain meaning of 'conforms' would be that the redevelopment plan present findings that are in 'agreement or harmony' with the comprehensive plan 'as a whole.'" *City of St. Charles v. DeVault Mgmt.*, 959 S.W.2d 815, 824 (Mo. App. E.D.1997).

■ "The purpose of a comprehensive plan is to guide the development and use of land within the city." *Id.* at 822 (citing *State ex rel. Westside Dev. v. Weatherby Lake*, 935 S.W.2d 634, 640 (Mo.App. W.D. 1996)). A comprehensive plan or a "master plan" "is a guide to development rather than an instrument to control land use." *State ex rel. Schaefer v. Cleveland*, 847 S.W.2d 867, 871 (Mo.App. E.D.1992). The comprehensive plan in this case is not a zoning document and cannot be used as

such. *Id.* A comprehensive plan serves as a guide and is intended to be updated and changed as conditions and policies warrant. *Turner v. City of Independence*, 186 S.W.3d 786, 791 (Mo.App. W.D.2006).

Appellants argue that the Redevelopment Plan does not conform to the 1991 Plan and the 1994 Supplement; further, Appellants argue that the 1999 Update was not passed in accordance with section 89.360 and is thus void.

The 1991 Plan stated that the City should focus its attention on future annexations of selected areas having the potential for commercial and industrial growth to broaden the tax base of the City. The "Future Land Use" map of the 1991 Plan shows the planned use north of the City was primarily industrial and commercial with the northernmost part agricultural. The Area was annexed in 1992. The 1994 Supplement anticipated "[a]dditional industrial areas … primarily to the north of the City." In the "Future Land Use" map of the 1994 Supplement, the planned use of the Area was the same as in the 1991 Plan—industrial, commercial, and agricultural. On December 1, 1999, the City adopted DSI's Land Use Plan, which DSI had used in preparing the Redevelopment Plan, as the 1999 Update to the 1991 Plan and 1994 Supplement. The 1999 Update and the Redevelopment Plan proposed a mixed-use development, incorporating office/warehouse, manufacturing/distribution, office, dining/entertainment, retail, ho-

---

11. In the prior appeal of this matter after a grant of summary judgment, in addressing the City's "but/for" finding, this court concluded that the necessity of flood protection could not be used to justify authorization of a TIF district when the problem was being remediated by a levee constructed without the use of TIF funding. *Great Rivers Habitat Alliance v. City of St. Peters*, 246 S.W.3d 556, 566 (Mo.App. W.D.2008). On retrial after re-

mand, Mr. Charnisky, Mr. Marks, and Mr. Wilkinson testified that the GO bonds were an interim financing measure and were issued in anticipation that the TIF special allocation fund monies would pay the bonds' principal and interest. This evidence, which was unavailable to our court at the time of the prior appeal, demonstrated the need for a TIF designation in order to accomplish the redevelopment.

tel/conference space, cultural, and recreational uses.

Julie Powers, the City's Director of Planning, testified that the 1991 Comprehensive Plan, with its 1994 Supplement and 1999 Update, is the master plan for the general development of the City, a general outline of how the City will be developed, including goals and objectives and implementation strategies. Powers testified that the intended land uses identified in the Redevelopment Plan conformed to the land use guidelines in the Comprehensive Plan.

Plan author Marks testified that the Redevelopment Plan he prepared conformed to the 1991 Plan and the 1994 Supplement. Both the 1991 Plan and the 1994 Supplement emphasized the need for additional land for industrial development and for development of a broader economic base. The Redevelopment Area was identified as a particularly attractive area for industrial development. In addition, the 1999 Update was the Land Use Plan prepared by DSI, upon which the Redevelopment Plan was based.

As to Appellants' argument that the 1999 Update was not passed in accordance with the statutory procedure set forth in section 89.360:

■ First, Appellants argue that there was no evidence that the 1999 Update was adopted by a resolution of the Commission. Section 89.360 requires that the Commission hold a public hearing on a plan amendment and adopt such amendment by resolution. The statute does not state that the resolution must be in writing. The action taken "shall be recorded" on the adopted plan "by the identifying signature of the secretary of the commission and filed in the office of the commission ... and a copy of the plan ... shall be certified to the [Board] and the municipal clerk." § 89.360.

City Director of Planning Powers testified that she presented the 1999 Update to the City's Planning and Zoning Commission ("Commission") at a public hearing. The 1999 Update was adopted by the Commission upon oral motion, was physically attached to the Comprehensive Plan, was retained in the Commission files, and was certified to the Board and the City Clerk.

■ We hold that the Commission adopted the 1999 Update by the motion and vote held at the public hearing:

> The term 'resolution' denotes something less formal than the term 'ordinance;' generally, it is a mere expression of the opinion or mind of the council concerning some matter of administration coming within its official cognizance, and provides for the disposition of a particular item of the administrative business of a municipal corporation.... A resolution is not a law, and in substance there is no difference between a resolution, order, and motion.

*Rice v. Huff*, 22 S.W.3d 774, 782 (Mo.App. W.D.2000) (internal quotation omitted) (holding motion and vote by Board of Alderman lacked sufficiency to effectuate vacation and abandonment of dedicated street; formal ordinance was necessary). "In the absence of some express requirement, a resolution need not be in any set or particular form...." *Julian v. Mayor of Liberty*, 391 S.W.2d 864, 867 (Mo.1965).

■ Second, Appellants contend that the absence of the "identifying signature" of the secretary of the Commission on the 1999 Update voided the update, rendering the Board's finding of conformance unreasonable, arbitrary, or capricious and, therefore, void. The trial court held that the signature requirement was merely directory and not mandatory because no sanction for noncompliance is provided by

statute; thus, the absence of the secretary's signature did not invalidate the 1999 Update, and the Board was entitled to rely on the 1999 Update as a valid action by the Commission adopting an amendment to the City's Comprehensive Plan.

The issue of whether a statute is mandatory or directory usually arises in the context of whether the failure to do a certain act results in the invalidity of a governmental measure. *State ex rel. Hunter v. Lippold*, 142 S.W.3d 241, 244 (Mo.App. W.D.2004). "Generally, the legislature's use of the word 'shall' removes any discretion from the official who is directed to perform the specified act." *Id.* at 245. However, when a statute merely requires certain things to be done and does not prescribe the results that shall follow in the event that the act is not performed, the statute is merely directory. *Id.* at 244. "In other words, the failure to timely perform the act does not invalidate the governmental action in question." *Id.* Whether the statutory word 'shall' is mandatory or directory is dependent on its context. *Farmers & Merchs. Bank & Trust Co. v. Dir. of Revenue*, 896 S.W.2d 30, 32 (Mo. banc 1995).

In this case, section 89.360 does not prescribe the results if the secretary of the Commission does not sign a comprehensive plan amendment. The context of the provision is the procedure for the approval of a comprehensive plan (and amendments thereto), which is a "plan for the physical development of the municipality." § 89.340. The plan "show[s] the commission's recommendations for the physical development and uses of land," *id.*, for "the general purpose of guiding and accomplishing a coordinated development of the municipality which will, in accordance with existing and future needs, best promote the general welfare, as well as efficiency and economy in the process of development."

§ 89.350. The plan does not regulate land use as a zoning ordinance does. *See City of Green Ridge v. Kreisel*, 25 S.W.3d 559, 563 (Mo.App. W.D.2000). The omission of a sanction in section 89.360 may be read as an expression of the legislature's desire to protect the Commission's actions from being declared invalid as a result of administrative oversight. In the circumstances presented in this case, we conclude that the lack of the Commission secretary's "identifying signature" does not invalidate the 1999 Update.

We conclude that substantial evidence supports the Board's legislative finding that the Redevelopment Plan conformed to the Comprehensive Plan for the development of the City as a whole. Appellants have not shown that the Board's conformance finding was clearly arbitrary or unreasonable; thus, we cannot and will not substitute our judgment for that of the Board. *Riggins*, 351 S.W.3d at 756.

Point I is denied.

### Points II and III—Constitutional Challenges

#### Jurisdiction

Pursuant to article V, section 3 of the Missouri Constitution, the Missouri Supreme Court possesses exclusive appellate jurisdiction in all cases involving the validity of a state statute. However, "[a] challenge to the construction and application of a law does not involve a constitutional challenge in an appellate jurisdictional sense." *Boot Heel Nursing Ctr., Inc. v. Mo. Dep't of Soc. Servs.*, 826 S.W.2d 14, 16 (Mo.App. W.D.1992).

Appellants claim in Point III that the trial court erred in ruling that the TIF Act definition of the term "blighted area" in sections 99.805(1) and 99.810 does not on its face violate article X, section 7 and article VI, section 21 of the Missouri Con-

stitution. Appellants argue that the Missouri Constitution limits property authorized for redevelopment to that which has previously been developed and later fell into decay.

In Point II, Appellants claim that the trial court erred in ruling that sections 99.805(1) and 99.810 as applied by the City violate article X, section 7 and article VI, section 21 of the Missouri Constitution. Appellants again argue that the Missouri Constitution limits property authorized for redevelopment to that which has previously been developed and later fell into decay, and ultimately argue that the land included in the TIF Area, as designated by Ordinance 3156, is agricultural land and not land that was previously developed and then decayed as required by the Missouri Constitution.

We conclude that Appellants' constitutional challenges to sections 99.805(1) and 99.810 are challenges to the construction and application of the laws and do not challenge the validity of the statutes themselves. Accordingly, this appeal does not fall within the exclusive jurisdiction of the Missouri Supreme Court, and jurisdiction is properly lodged in this court. Furthermore, the Missouri Supreme Court transferred the subject case to this court by Order dated August 22, 2006 (in the first appeal of this case), citing article V, section 11 of the Missouri Constitution, which provides for a transfer of the proceeding to the appellate court having jurisdiction.

## Standard of Review

The trial court's interpretation of the Missouri Constitution is reviewed *de novo*. *City of Arnold v. Tourkakis,* 249 S.W.3d 202, 204 (Mo. banc 2008). The constitutional validity and construction of state statutes are also reviewed *de novo*. *Sch. Dist. of Kansas City v. State,* 317 S.W.3d 599, 604 (Mo. banc 2010).

## Analysis

 Because the Appellants' second and third points on appeal are related, we address them together, but in reverse order.

In their third point on appeal, Appellants assert that the trial court erred in ruling that the term "blighted area" as defined in sections 99.805(1) and as used in 99.810 in describing the required contents of the redevelopment plan does not violate article X, section 7 and article VI, section 21 of the Missouri Constitution because those constitutional provisions require that land be previously developed and then decayed as a prerequisite to finding that the land is blighted, and the term "blighted area" as used in the TIF Act is not sufficiently circumscribed to effect this constitutional limitation.

Article VI, section 21 permits a city to, among other things, enact ordinances "providing for the clearance, replanning, reconstruction, redevelopment and rehabilitation of blighted, substandard or insanitary areas." Article X, section 7 of the Missouri Constitution authorizes partial tax relief to encourage "the reconstruction, redevelopment, and rehabilitation of obsolete, decadent, or blighted areas."

Neither article X, section 7 nor article VI, section 21 define the word "blighted." Thus, we turn to the rules of construction to determine its meaning. "In general, constitutional provisions are subject to the same rules of construction as other laws, except that constitutional provisions are given a broader construction due to their more permanent character." *Neske v. City of St. Louis,* 218 S.W.3d 417, 421 (Mo. banc 2007) (*overruled on other grounds by King–Willmann v. Webster Groves Sch. Dist.,* 361 S.W.3d 414, 417 n. 4 (Mo. banc 2012)). A court "is required to give due

regard to the primary objectives of the constitutional provision under scrutiny, as viewed in harmony with all related provisions." *Id.* We are guided by the principle that " '[i]n arriving at the intent and purpose[,] the construction [of constitutional provisions] should be broad and liberal rather than technical, and the constitutional provision should receive a broader and more liberal construction than statutes.' " *Sch. Dist. of Kansas City,* 317 S.W.3d at 605 (quoting *State Highway Comm'n v. Spainhower,* 504 S.W.2d 121, 125 (Mo. 1973)).

When interpreting a constitutional provision, we must consider the words used in their plain and ordinary meaning. *In re Finnegan,* 327 S.W.3d 524, 526 (Mo. banc 2010). If a word used is not defined, we determine the plain and ordinary meaning of the word by its dictionary definition. *Id.* The dictionary defines "blight" as "a condition or influence that lowers the value of real estate," and "blighted" as "affected by blight ... *esp. of real estate:* marked by termination of healthy growth and development accompanied by deterioration and decline of property values." WEBSTER'S THIRD NEW INT'L DICTIONARY UNABRIDGED 233 (1993). From these definitions, the indicium of blight is a decline in the value of real estate. Thus, in an area where property values have deteriorated and declined, the Constitution permits municipalities to encourage growth and development through tax relief and through activities that will arrest the decline in property value and stimulate its increase.

Appellants focus on the language used to describe the acts by which blight may be remedied ("clearance, replanning, reconstruction, redevelopment and rehabilitation" in article VI, section 21; "reconstruction, redevelopment, and rehabilitation" in article X, section 7) to argue that by using words with the "re-" prefix, the Constitution limits a blighted area to one in which the property has been previously developed and subsequently decayed. Appellants have not argued categorically that agricultural land can never be "blighted" in the constitutional sense, and we do not address any such argument (*see supra* note 9). Here, the evidence was that the Redevelopment Area had previously been developed with, among other things, numerous farm structures, internal farm access roads, agricultural levees, and a golf course development, and that those site improvements had decayed over time, rendering both farming and the golf course operation unprofitable, due to lack of proper maintenance and due to the effect of the flooding on the property. Even if the Constitution requires that "blighted" areas have decayed from a prior state of development, that condition was satisfied in this case.

Points II and III are denied.

## Point IV—Redevelopment Project Finding

In their fourth point on appeal, Appellants assert that the trial court erred in upholding the Redevelopment Plan because the City failed to approve a specific redevelopment project as required by statute. Appellants argue that no discreet, definable redevelopment project was included in the Redevelopment Plan adopted by Ordinance 3156, and therefore, the ordinance is invalid.

However, Appellants did not raise this issue at trial and, therefore, have not properly preserved this claim of error. "Issues raised for the first time on appeal are not preserved for review." *City of Kansas City v. Chung Hoe Ku,* 282 S.W.3d 23, 28 (Mo.App. W.D.2009) (internal quotation omitted). In none of the eleven counts of Appellants' Joint Petition do they assert

that the relevant ordinances fail to comply with the TIF Act because there was no definable redevelopment project included in the Redevelopment Plan.[12]

If Appellants had a legitimate claim that the City failed to comply with section 99.810 and adopt a redevelopment project for the Area, it was incumbent upon them to raise the issue at trial, "either giving the City the opportunity to present evidence showing compliance or giving the trial court the opportunity to make a specific finding of fact on the issue." *Chung Hoe Ku*, 282 S.W.3d at 29.[13]

Point IV is denied.

### Point V—Plan and Project Change

In their fifth point on appeal, Appellants claim that the trial court erred in ruling that the City's Ordinance 4291 did not violate section 99.825 as a matter of law. Appellants argue that the Ordinance unlawfully changed the developer of the project and unlawfully authorized changes to the general land uses in the original Development Plan.

### Standard of Review

"An ordinance of a municipality is presumed to be valid...." *Parking Sys., Inc. v. Kansas City Downtown Redevelopment Corp.*, 518 S.W.2d 11, 16 (Mo.1974). The burden of rebutting that presumption rests with the challenger. *Id.*

### Analysis

Section 99.825.1 requires that "[a]fter the adoption of an ordinance approving a redevelopment plan or redevelopment project, or designating a redevelopment area, no ordinance shall be adopted altering the exterior boundaries, affecting the general land uses established pursuant to the redevelopment plan[,] or changing the nature of the redevelopment project without complying with the procedures provided in this section [public hearing before the TIF Commission] pertaining to the initial approval of a redevelopment plan or redevelopment project and designation of a redevelopment area." Appellants contend that

---

**12.** Additionally, the trial court permitted the parties to submit proposed findings of facts and conclusions of law. In their proposed findings submitted to the trial court, Appellants do not request a factual finding on the issue of whether a Redevelopment Project was identified by the City. "Under Rule 73.01, a party is required to specify the controverted fact issues on which it is seeking findings and, if not requested, all fact issues are found in accordance with the judgment." *City of Kansas City v. Chung Hoe Ku*, 282 S.W.3d 23, 29 (Mo.App. W.D.2009).

**13.** *Ex gratia*, we note that in reviewing the legislative determination by the Board, this court is not limited to the record presented to the legislative body. *Land Clearance for Redevelopment Auth. of City of St. Louis v. Inserra*, 284 S.W.3d 641, 646 (Mo.App. E.D.2009). " 'The pertinent inquiry is ... not what matters may have been literally or physically before the [Board] or present in the lawmakers' minds, but rather whether the [Board's] ac-

tion when viewed in the light of the facts existent at the time of enactment of the Ordinance was reasonably doubtful or fairly debatable.' " *Id.* (quoting *Desloge v. County of St. Louis*, 431 S.W.2d 126, 132 (1968)). Here, Mr. Marks testified at trial to both the Redevelopment "Plan" and specific Redevelopment "Projects" necessary to implement the Plan. Marks provided detailed testimony with specific cost projections about infrastructure improvements necessary to remedy the flooding conditions in the Area before mixed-use commercial development (office/warehouse, manufacturing, office, dining/entertainment, retail, hotel/conference, cultural, and recreation) could reasonably proceed. Accordingly, even were we to conclude that this issue was tried by implied consent, there was substantial evidence in the record of the Board's approval of specific redevelopment projects, as opposed to vague aspirational goals lacking specific project details or specific cost calculations, necessary to implement the Plan.

Ordinance 4291 significantly changed the original Plan adopted by the City in Ordinance 3156, and because the TIF Commission did not hold public hearings as required by section 99.825.1, the changes to the Plan contained in Ordinance 4291 were adopted in violation of the TIF Act.

The trial court concluded that Ordinance 4291 authorized the City to enter into a Joint Development Agreement with a private entity and was not adopted in violation of the notice requirements of section 99.825 because it made no alterations to the Area's exterior boundaries, it did not affect the land uses established under the Plan, and it did not change the nature of the redevelopment project outlined in the Plan.

We find that the trial court's conclusions are supported by substantial evidence. The Ordinance expressed the City's desire to foster economic development within the City on City-owned real property with the named developer's cooperation. The Ordinance approved a Joint Development Agreement with the named developer for the sale and purchase of the City's real property in the Area. Attached to the Joint Development Agreement was a proposed Planned Urban Development ("PUD") Agreement. Even though the PUD Agreement contemplated a number of permitted uses, including a residential subdistrict, the City and the named developer had not agreed to the PUD Agreement at the time of the adoption of the Ordinance, and in fact, the PUD Agreement was never executed by the City or by any joint developer. Thus, Ordinance 4291 did not alter the exterior boundaries of the Area, affect the general land uses, or change the

nature of the land uses in the Plan approved by Ordinance 3156; accordingly, the procedural requirements of section 99.825 were not triggered.

Appellants also argue that Ordinance 4291 changed the redeveloper from the City to a private entity, thereby triggering the procedural requirements of section 99.825. However, by its terms, section 99.825.1 does not require that the TIF Commission consider a change in redeveloper. Furthermore, the Joint Development Agreement clearly states that the named private developer is *cooperating* with the City in the redevelopment project, not *replacing* the City in that role.

Point V is denied.

**Point VI—Affirmative Defenses**

In addition to the substantive analysis in favor of the Respondents in the trial court's judgment, the trial court also noted alternative grounds supporting its judgment—namely, affirmative defenses that had been pled by the Respondents (laches, unclean hands doctrine, statute of limitations, and standing). Specifically, the trial court noted that the affirmative defenses pled by Respondents "are held by this court to be established and the Judgment herein is *further* supported by these defenses." (Emphasis added.)

In their final point on appeal, Appellants challenge the trial court's rulings on these procedural affirmative defenses. In light of our rulings on Points I through V, Appellants' Point VI has been rendered moot. Thus, we need not and do not address Appellants' argument of error in Point VI.[14]

**14.** We further note that Appellants' Point VI does not comply with Rule 84.04(d). "[G]rouping multiple contentions not related to a single issue violates Rule 84.04." *Goodson v. Dryden (In re Swearingen)*, 42 S.W.3d 741, 748 (Mo.App. W.D.2001). "By including numerous grounds into one point of error, the result is that the point contains multiple legal issues." *Mello v. Williams*, 73 S.W.3d 681, 685 (Mo.App. E.D.2002). Here, Appellants'

## Conclusion

The judgment of the trial court is affirmed.

JOSEPH M. ELLIS, Presiding Judge, and ALOK AHUJA, Judge, concur.

Point VI conglomerated four separate trial court rulings on various affirmative defenses in one point relied on, which violates Rule 84.04(d). Nonetheless, as we have said in the main text of this opinion, Point VI has been

rendered moot and it is on this basis that we choose not to address the claimed error(s) of the trial court's rulings on various affirmative defenses.